**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **FRATERNAL ORDER OF POLICE, D.C.** | ) | |
| **LODGE 1, NDW LABOR COMMITTEE, INC.,** | ) | |
| *ET AL.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No:  08-0039 (RJL)** |
| | ) | |
| **ROBERT M. GATES,** | ) | |
| **Secretary, U.S Department of Defense,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION TO DISMISS**

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), Defendant Robert M. Gates, Secretary of the Department of Defense, moves to dismiss the above-captioned case for lack of subject matter jurisdiction and for failure to state a claim.

In support of the said Motion, Defendant refers the Court to the accompanying Memorandum of Points and Authorities and Proposed Order.

Dated: May 9, 2008.                   Respectfully Submitted,

                              __/s/  Jeffrey A. Taylor_____
                              JEFFREY A. TAYLOR, D.C. BAR # 498610
                              United States Attorney

                              __/s/   Rudolph Contreras_____
                              RUDOLPH CONTRERAS, D.C. BAR #434122
                              Assistant United States Attorney

                              __/s/   John C. Truong_____

JOHN C. TRUONG, D.C. BAR #465901
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 307-0406

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **FRATERNAL ORDER OF POLICE, D.C.** | ) |
| **LODGE 1, NDW LABOR COMMITTEE, INC.,** | ) |
| *ET AL.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )      **Case No: 08-0039 (RJL)** |
| | ) |
| **ROBERT M. GATES,** | ) |
| **Secretary, U.S Department of Defense,** | ) |
| | ) |
| **Defendant.** | ) |

_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANT'S MOTION TO DISMISS**

**I.      Introduction.**

In this Complaint, Association Plaintiffs and Individual Plaintiffs[1] allege that the

Department of the Navy's Level I oleoresin capsicum spray training, as part of the Department's

non-lethal weapon training program, violates their Fifth Amendment rights and the

Administrative Procedure Act ("APA").  Oleoresin capsicum ("OC") spray is more commonly

known as pepper spray.  Level I training requires that the trainee receive a short OC spray in the

face.

Counts I to III of the Complaint allege that this type of training violates the Fifth

Amendment rights of both the Association Plaintiffs and Individual Plaintiffs because the OC

_____

[1]      There are five plaintiffs listed in the Complaint, including two associations and
three individuals. The two association plaintiffs are the Fraternal Order of Police, D.C. Lodge 1
and Fraternal Order of Police First Federal Lodge 1-F (hereinafter "Association Plaintiffs").  The
three individual plaintiffs include Messrs. Joseph Barbetta, Anthony Anziedo, and James. W.
Waters (hereinafter  "Individual Plaintiffs").  These Individual Plaintiffs are civilian police
officers working for the Department of the Navy, a department of the Department of the
Defense.  Compl. at ¶ 8, 9 and 10.

spray would cause bodily injury and other emotional harm.  However, the Complaint fails as a matter of law because it does not specify what procedural or substantive due process rights under the Fifth Amendment are being violated because of this type of law enforcement training.

Counts IV and V generally allege that the OC spray training violates the APA but these two counts fail to identify the specific "agency decision" being challenged.  Assuming *arguendo* that the policy that set forth the training program itself is an "agency decision" as defined under the APA, the Complaint fails to allege how that policy is arbitrary, capricious or violates the law. Furthermore, claims asserted by the Association Plaintiffs and Plaintiff James A. Waters are untimely because they were filed more than four years the statute of limitation had accrued. Finally, under the association standing doctrine, the Association Plaintiffs do not have standing to sue on behalf of their members because the alleged claims are too individualized and, thus, the individual members are required to be involved in the lawsuit.

For these reasons and those further elaborated on below, the Court should grant Defendant's dispositive motion and dismiss this case with prejudice.

## II.    **Background**.

Under regulations prescribed by the Secretary of Defense, civilian officers and employees of the Department of Defense may carry firearms or other appropriate weapons.  10 U.S.C. §1585.  In that connection, in 1996, the Department of Defense ("DOD") issued Directive No. 3000.3 that sets forth a policy regarding the development and employment of non-lethal weapons.  Declaration of Lt. Col. Stephen Simpson (Lt. Col. Simpson Decl.") at ¶ 3 (Gov. Exh. 6).  This policy applies to all the military departments.  See Department of Defense Directive 3000.3, at ¶2.1  ("DOD Directive 3000.3") (Gov. Exh. 1).  The idea of developing a policy on

the use and training of non-lethal weapon grew out the Marine Corp's successful experience in withdrawing 2,500 United Nations peacekeepers from Somalia.  Lt. Col. Simpson Decl. at ¶ 4.  Pursuant to DOD Directive 3000.3, a Joint Non-Lethal Weapons Directorate was created.  Id. at ¶ 5.  As a result of DOD Directive 3000.3, Lt. Col. Stephen Simpson was specifically assigned to work on the development of a training course on non-lethal weapons, including the use of OC spray.  Lt. Col. Simpson Decl. at ¶ 6.

Non-lethal weapons are explicitly designed and primarily employed so as to incapacitate personnel or materiel, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment.  Lt. Col. Simpson Decl. at ¶ 7.  Non-lethal weapons means a method short of gross physical destruction to prevent the target from functioning.  Id.  Non-lethal weapons are characterized as having either reversible effects on personnel or materiel or affecting objects differently within their area of influence or both.  See Lt. Col. Simpson Decl. at ¶ 7; DOD Directive 3000.3, at ¶¶3.1 – 3.1.2.2.

In July 2000, the Department of the Navy issued the Chief of Naval Operations Instruction 5580.1A ("OPNAVINST 1A"), which implemented DOD Directive 3000.3 for law enforcement purposes.  See Gov. Exh. 2.  This manual sets forth the policy on the use of non-lethal weapons, including the use and training of Oleoresin Capsicum ("OC") spray.  See OPNAVINST 5580.1A, at Chapter 4.  This manual details procedures, provides guidance and sets forth standards for military and civilian Navy personnel performing law enforcement duties.  OPNAVINST 5580.1A (section Purpose). The manual does not create any substantive or procedural rights.  Id.

In January 2007, the Department of the Navy issued the Chief of Naval Operations

Instruction 5530.14D (OPNAVINST 5530.14D), which revised OPNAVINST 5580.1A and

OPNAVINST 5530.14C.[2]  In essence, this revised manual combined the two prior manuals into

one new instruction.   Similar to OPNAVINST 5580.1A, the revised manual does not create any

substantive or procedural rights but only expanded on the development and the use of non-lethal

weapons, including OC spray. See OPNAVINST 5530.14D, Chapter 13 (Gov. Exh.  3).  The

Department of the  Navy has a policy that law enforcement and security personnel may only use

that level of force necessary to control or stop unlawful resistence or to prevent the commission

of a serious offense. OPNAVINST 5580.1A, at Ch. 4 §0401b; OPNAVINST 5530.14D, at

Chapter 13 §1300.  Depending upon the threat involved and the conduct of the subject, use of

force ranges from verbal commands, take down techniques, handcuffs, riot control agents, to

include OC spray, military working dogs to deadly force.  OPNAVINST 5580.1A, Chapter 4

§0403; OPNAVINST 5530.14D, at Chapter 1302 - 1305.  The Department of the Navy requires

that personnel will not use OC spray until they have been trained in its use.  OPNAVINST

5580.1A, at Chapter 4, §0403 d(3); OPNAVINST 5530.14D, at Chapter 13, §1304 f.

Approximately 95 percent of the Naval District of Washington law enforcement officers

have received Level I OC spray training since 2000.  All of these law enforcement officers, with

the exception of supervisors are members of the Fraternal Order of Police.  See Declaration of

Eric Hammett at ¶ 4-6 (Gov. Exh. 4).

Both the Association Plaintiffs and Individual Plaintiffs file this Complaint alleging that

Defendant's Level 1 OC spray training violates their Fifth Amendment rights and the APA.

---

[2]      OPNAVINST 5580.14C is a manual that deals with policies and guidance
concerning uniform standards for safeguarding war fighting assets and war materiel at Navy
shore installations.

Level 1 OC spray training includes a direct facial OC spray of Individual Plaintiffs.  Complaint ("Compl.") at ¶ 27.[3]  Plaintiffs claim that direct facial OC spray causes certain bodily and psychological injuries and request that Defendant be enjoined from using OC spray on Individual Plaintiffs as part of their training.  See Compl. at Prayer for Relief , ¶ C.

## III.    Standard of Review.

### A.    Rule 12(b)(1) – Lack Of Subject Matter Jurisdiction Standard.

On a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of establishing, by a preponderance of the evidence, the court has jurisdiction.  Filebark v. U.S. Depart. of Transp., – F. Supp.2d – 2008 WL 839206, at *3 (D.D.C. Mar. 31, 2008) (Leon, J.).  Because subject matter jurisdiction focuses on the court's power to hear a case, plaintiff's factual allegations must be more closely scrutinized than is required when resolving a 12(b)(6) motion.  Rempfer v. FDA, 535 F. Supp. 2d 99, 106 (D.D.C 2008) (citing Macarhia v. United States, 334 F.3d 61, 64 (D.C. Cir. 2003)).

### B.    Rule 12(b)(6) – Failure To State A Claim.

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the Court will dismiss a claim if Plaintiff's complaint fails to plead "enough facts to state a claim for relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (clarifying the standard from Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Aktieselskabet v. Fame Jeans, Inc., -- F.3d ---, 2008 WL 1932768

---

[3]    It appears that Plaintiffs are not alleging that Level II and Level III OC training methods violate their Fifth Amendment rights or the APA.  Level II OC training only requires a smearing of the OC spray on the skin under a trainee's eyes.  Compl. at ¶ 27.  Level III only requires "a non-impact exposure" to the OC spray.  Id.

(D.C. Cir. Apr. 29, 2008); In re Sealed Case, 494 F.3d 139, 145 (D.C. Cir. 2007) (citing

Twombly).  Hence, the focus is on the language in the complaint, and whether that language sets

forth sufficient factual allegations to support plaintiff's claims for relief.

The court must construe the factual allegations in the complaint in the light most

favorable to Plaintiff and must grant Plaintiff the benefit of all inferences that can be derived

from the facts as they are alleged in the complaint.  Barr v. Clinton, 370 F.3d 1196, 1199 (D.C.

Cir. 2004) (citing Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

However, the Court need not accept any inferences or conclusory allegations that are

unsupported by the facts pleaded in the complaint.  Kowal, 16 F.3d at 1276.  Moreover, the

Court need not "accept legal conclusions cast in the form of factual allegations."  Id.

Furthermore, as a general matter, the Court is not to consider matters outside the

pleading, per Rule 12(b), without converting defendant's motion to a motion for summary

judgment.  In interpreting the scope of this limitation, however, the D.C. Circuit has instructed

that the Court may also consider "any documents either attached to or incorporated in the

complaint and matters of which we may take judicial notice."  EEOC v. St. Francis Xavier

Parochial School, 117 F.3d 621, 624 (D.C. Cir. 1997).

IV.    **Argument**

A.    **Counts IV and V: Plaintiffs' APA Claims.**[4]

1.    **The CSRA Precludes Plaintiffs' APA Claims**.

According to the Complaint, the Association Plaintiffs are the exclusive representatives of their members "concerning personnel policies and practices and other conditions of employment." Compl. at ¶ 6 and 7. The Association Plaintiffs claim that they "provide legal representation . . . on all matters relating to a member's employment." Compl. at ¶ 18. In his case, the Individual Plaintiffs claim that they have "a property interest in their position" and are "adversely affected by the unlawful [OC spray training] policy at issue." Compl. at ¶ 8-10. In essence, the Complaint alleges that Defendant's employment practice and personnel policy (i.e., the OC spray training program) violates the APA. However, under the Civil Service Reform Act ("CSRA"), the Court does not have jurisdiction over Plaintiffs' APA claims.

In 1978, Congress enacted the Civil Service Reform Act ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 (codified, as amended, in various sections of 5 U.S.C.), to replace a "patchwork system" of federal personnel law "with an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." United States v. Fausto, 484 U.S. 439, 443 (1988). The personnel system created by the CSRA provides a comprehensive scheme of protections and remedies for federal employment disputes. See Fornaro .v James, 416

---

[4]    Although Counts IV and V specifically allege violations of the APA, Plaintiffs' Count I to III also reference violations of the APA. Therefore, it is more logical to address the APA claims first because the merit of Plaintiffs' entire Complaint depends on whether Plaintiff has identified a particular "agency decision."

F.3d 63, 67 (D.C. Cir. 2005);  Croddy v. FBI, Civil Action No. 00-651(EGS), 2006 WL

2844261, *5 (D.D.C. Sept. 26, 2006); Hall v. Clinton, 143 F.Supp.2d 1, 5 (D.D.C.

2001)("Congress intended for the CSRA to be a comprehensive remedy for federal employees

with individualized job grievances.").

Courts have held, however, that "[e]ven if the CSRA does not provide a [specific]

remedy for a particular federal employee, the CSRA still precludes personnel-based APA claims

because that means the contested action is committed to agency discretion by law." Croddy,

2006 WL 2844261, *5; see also Fornaro, 416 F.3d at 67 ( observing ". . .the CSRA review

provisions could not be supplemented by an implied right of action. . ." and consistent with

Carducci v. Regan, 714 F.2d 171, 174-75 (D.C. Cir. 1983), no remedy is "available under the

APA for an employment claim as to which the CSRA provide[s] no relief.").

Given the comprehensive remedial scheme provided under the CSRA, the D.C. Circuit

"has concluded that the CSRA eliminates the right to judicial review under the APA for adverse

actions that fall within the CSRA's scope." Doe P v. Goss, No. 04-2122, 2007 WL 106523, * 6

(D.D.C. Jan. 12, 2007) (citing Carducci v. Regan, 714 F.2d 171, 174 (D.C. Cir. 1983)); Graham

v. U.S. Dep't of Justice, No. 02-1231 ESH, 2002 WL 32511002, *2 (D.D.C. Nov. 20, 2002)

(noting that "[t]he law is well established that the CRSA displaces all other bases for judicial

review of personnel actions taken against federal employees, including the APA.") (citing Tiltti

v. Weise, 155 F.3d 596, 600 (2d Cir. 1998)).  Indeed, if the courts were to review personnel

actions, "'the exhaustive remedial scheme of the CSRA would be impermissibly frustrated.'"

Doe P, 2007 WL 106523, at * 6 (quoting Carducci, 714 F.2d at 174).

Here, while Plaintiffs have not specifically alleged that the Level I OC spray training

program constitutes a prohibited personnel practice in their Complaint, the Court is not bound by

their legal conclusions or characterizations.  See Bell Atlantic Corp. v. Twombly, — U.S. —,

127 S. Ct. 1955, 1964-65 (2007); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276

(D.C. Cir. 1994); Kivanc v. Ramsey, 407 F. Supp. 2d 270, 277 (D.D.C. 2006).  Level I OC spray

training is part of the training for law enforcement officers working for the Navy.  See Hammett

Decl. at ¶ 4.  In fact, 95%  of civilian law enforcement officers have received this type of

training.  Id.  In light of these facts, based on the allegations, the Complaint appears to claim that

failure to complete the Level I OC spray training may lead the Individual Plaintiffs to be

removed from federal service.  However, such a removal action would be covered under the

CSRA.  Since there is an alternative procedural remedy under the CRSA for the Individual

Plaintiffs if they are removed from federal service, this Court does not have subject matter

jurisdiction to review the DOD Directive 3000.3 and OPNAVINST 5530.14D under the APA.

See Graham, 2002 WL 3251002, at *3 (concluding that "[t]he CSRA's comprehensive scheme

for processing and adjudicating employment disputes between federal civil servants and their

employers governs this case and bars the Court from reaching the merits of plaintiff's APA

claim."); see also Doe P, 2007 WL 106523, at * 6 (concluding that "[t]he CSRA precludes APA

actions challenging personnel actions . . . including terminations.").  The APA simply does not

provide an avenue for federal employees, like the Individual Plaintiffs here, to have the district

court decide what training they can and cannot be required to complete.  As the Court has

indicated in another context, it is not a super-personnel department.  See, e.g., Thomas v.

Gandhi, 525 F. Supp.2d 103

(D.D.C. 2007) (Leon, J.)  (observing that, in a Title VII context, courts "have consistently

declined to serve as a super-personnel department that reexamines an entity's business

decisions.") (citing Barbour v. Browner, 181 F.3d 1342, 1346 (D.C.Cir.1999)).

On the other hand, if the decision to develop and use OC spray (including training

involving OC spray) does not fall squarely within CSRA's comprehensive remedial scheme,

Plaintiffs still do not have a viable APA claim because Congress intended certain agency actions

to be committed to agency discretion by law and not judicially reviewable.  See Graham, 2002

WL 32511002, at *2 (observing that "if the action is one for which the CSRA provides no basis

for judicial review, then Congress' decision to deny such review evinces its intent that the matter

be deemed 'committed to agency discretion by law,' 5 U.S.C. § 701(a)(2), and therefore beyond

the ken of the APA) (internal citations omitted).  Accordingly, under the law, the Court may not

review the reasonableness of the Level I OC spray training, as set forth in DOD Directive 3000.3

or OPNAVINST 5530.14D, because the decision to develop and implement that training

program is committed to Defendant's discretion by law.  The Court, therefore, should dismiss

Plaintiffs' APA claim for lack of subject matter jurisdiction.

## 2.    The Complaint Fails To Identify An Agency Decision Being Challenged.

Even assuming that Plaintiffs' APA claims are not precluded under the CSRA, those

claims still fail as a matter of because Plaintiffs fail to identify a particular agency decision that

gives rise to Plaintiffs' claims.

Although the Complaint fails to identify the specific agency decision that allegedly

violated the APA, the Complaint refers to two regulations: (1) Department of Defense Directive

3000.3, entitled "Policy for Non-Lethal Weapons" ("DOD Directive 3000.3"); and (2) the Chief

of Naval Operations Instruction 5530.14D,  whose subject is "Navy Physical Security and Law

Enforcement" ("OPNAVINST 5530.14D").  Compl. at ¶ 22, 25.  Neither of these, however, constitutes an agency action as defined by the APA.

Under the APA, agency actions are defined to include, in part, orders, licenses, or sanctions.  5 U.S.C. § 551(13).  A reviewable final order is an agency disposition that "mark[s] the 'consummation of the agency's decision making process,' and it 'must determine rights or obligations' or give rise to 'legal consequences.'"  Safe Extensions, Inc. v. FAA, 509 F.3d 593, 598 (D.C. Cir. 2007) (quoting City of Dania Beach v. FAA, 485 F.3d 1181, 1187 (D.C. Cir. 2007)).

Here, neither the DOD Directive 3000.3 nor OPNAVINST 5530.14D  would qualify as an agency decision or "order."  DOD Directive 3000.3, issued on July 9, 1996, merely establishes the Department of Defense ("DOD") policy on non-lethal weapons.  See DOD Directive 3000.3 , at ¶ 1.1 (Gov. Exh. 1).  The Directive defines what constitutes non-lethal weapons and sets forth the policy for the use of non-lethal weapons.  Id. at ¶ 3.1 and 4.1.  The Directive also sets forth the responsibilities of the various Under Secretaries of Defense to develop and employ non-lethal weapons.  Id. at ¶ 5.1 et seq.  DOD Directive 3000.3 does not give rise to legal consequences.

As for OPNAVINST 5530.14D, the second manual referenced in the Complaint, it is merely a "revision" of two previous manuals implementing DOD Directive 3000.3.  See OPNAVINST 5530.14D (Gov. Exh.3) (only applicable pages are attached).  The Complaint, however, inaccurately alleges that OPNAVINST 5530.14D is the manual that "approved" the Navy-wide OC spray training for civilian officers.   See Compl. at ¶ at 25.  Contrary to the allegations, Section 1 of OPNAVINST 5530.14D explicitly states that, "This instruction is a

complete revision" of OPNAVINST 5580.1A .[5]  In short, OPNAVINST 5530.14D is merely a

revision of OPNAVINST 5580.1A and does not set forth new policies on non-lethal weapons.

Like DOD Directive 3000.3, the OPNAVINST 5530.14D manual does not give rise to any legal

consequences.  See Gov. Exh. 3 (section Purpose).  Without more, the Association Plaintiffs and

Individual Plaintiffs have not identified an agency decision subject to a challenge under the

APA.  Therefore, Plaintiffs' APA claims (Counts IV and V) should be dismissed for failure to

state a claim.

### 3.    The Agency Decision Is Committed to Agency Discretion.

Assuming that DOD Directive 3000.3 and OPNAVINST 5530.14D are deemed to be

agency decisions under the APA, these two regulations are committed to the discretion of the

Agency and not subject to judicial review.

Under the APA, agency action is not subject to judicial review to the extent that such

action "is committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  As the Supreme Court

explained in Heckler v. Chaney, 470 U.S. 821, 830 (1985), and reiterated in Lincoln v. Vigil,

508 U.S. 182 (1993), Section 701(a)(2) mandates that "review is not to be had" in those rare

circumstances where there is "no meaningful standard against which to judge the agency's

exercise of discretion."  Lincoln, 508 U.S. at 190.  The Supreme Court reasoned that "if no

judicially manageable standards are available for judging how and when an agency should

exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'"

Heckler, 470 U.S. at 830.  "Agency action is committed to agency discretion by law when 'the

---

[5]      It is not disputed that Individual Plaintiffs are civilian police officers working for
the Navy and are performing law enforcement functions.  Compl. at ¶ 9, 10, and 11.

statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"  Steenholdt v. FAA, 314 F.3d 633, 638 (D.C. Cir. 2003).  "The ban on judicial review of action committed to agency discretion by law is jurisdictional."  Baltimore Gas & Elec. Co. v. FERC, 252 F.3d 456, 458 (D.C. Cir. 2001).

    National security issues are the type of actions that are often found to be committed to the discretion of the agency.  See, e.g., Franklin v. Massachusetts, 505 U.S. 788, 818 (1992) (Stevens, J., concurring) (observing that " the Court has limited the exception to judicial review provied by 5 U.S.C. §701(a)(2) to cases involving national security.") (citing Webster v. Doe, 486 U.S. 592 (1988); Dep't of Navy v. Egan, 484 U.S. 518 (1988); Heckler v. Chaney, 479 U.S. 821, 830 (1985)).  Indeed, when confronted with challenges of agency decisions that implicated national security under the APA, the D.C. Circuit has held that such agency decisions are committed to agency discretion, not judicially reviewable.  See  District No. 1, Pacific Coast Dist., Marine Eng.' Beneficial Assoc. v. Maritime Admin., 215 F.3d 37 (D.C. Cir. 2000); Nat'l Federation of Fed. Employees v. United States, 905 F.2d 400 (D.C. Cir. 1990).

    In District No. 1, the plaintiffs challenged the Maritime Administration's ("MARAD") decision to transfer eight vessels from the United States to the Republic of the Marshall Islands, alleging that the transfer was arbitrary and capricious under the APA.  215 F.3d at 41.  The D.C. Circuit rejected plaintiffs' APA claim and explained that "a cursory examination of the [transfer] order under review in this case reveals that the primary factors driving MARAD's decision are national defense, the adequacy of the merchant marine, foreign policy, and the national interest."  Id. at 41.  The D.C. Circuit further explained that for it to determine whether MARAD's transfer order was reasonable would require the court to second guess judgments on questions of foreign

policy and national interest.  Id. at 42.  The D.C. Circuit concluded that such judgments "are not

fit for judicial involvement."  Id.

Similarly, in National Federation, the D.C. Circuit rejected plaintiffs' challenge of a

decision to close certain military bases under the APA.  905 F.23d at 402.  The D.C. Circuit held

the Secretary of Defense's decision to close bases was committed to agency discretion by law

and not subject to review under the APA.  Id. at 405.  The D.C. Circuit observed that courts are

ill equipped to  conduct review of the nation's military policy.  Id. at 405.

In this case, DOD Directive 3000.3, the policy on the non-lethal weapons, is committed

to agency discretion and Plaintiffs have not alleged a manageable standard for judicial review of

the Directive.  Indeed, DOD Directive 3000.3 specifies that it "establishes DoD policies and

assigns responsibilities for the development and employment of non-lethal weapons."  DOD

Directive 3000.3, at ¶ 1.1 (Gov. Exh. 1).  DOD Directive 3000.3 also explains that the policy

behind the use of non-lethal weapons is to "enhance the capability of U.S. forces to accomplish"

certain objectives, including prevent hostile action; limit escalation; avoid using lethal force in

certain military action; and better protect our forces.  DOD Directive 3000.3, at ¶ 4.2.1 to 4.2.4.

In implementing DOD Directive 3000.3, on July 26, 2000, the Department of Navy

issued OPNAVINST 5580.1A.  See OPNAVINST 5580.1A, at ¶ 1.  Chapter 4 of OPNAVINST

5580.1A set forth the policies on the use of force, the methods of force and the necessary training

on the use of force.  For instance, Chapter 4 specifically identified the use of OC spray as a form

of riot control.  See OPNAVINST 5580.1A, at Chapter 4, § 0403 (Gov. Exh.2).  In that vein,

Chapter 4 also required that "[l]aw enforcement personnel will not be issued chemical agents

until they have been trained in their use and knowledgeable of safety precautions involved with

14

chemical agents." Id. at Chapter 4, §0403.d (3).  OPNAVINST 5580.1A applied to "civilian

Navy personnel performing law enforcement duties." Id. at ¶1.

In January 2007, the Department of the Navy issued OPNAVINST 5530.14D, which

revised OPNAVINST 5580.1A and further expanded the use of OC spray as a form of non-lethal

weapon. See OPNAVINST 5530.14D, at Chapter 13.  In short, the Directive and the manuals

implicate national interest and national security questions, and they are the type of decisions that

the D.C. Circuit has held that are committed to agency discretion and has counseled against

judicial review because courts are not equipped to review military policies. See Nat'l

Federation, 905 F.2d at 405.  Accordingly, the Court should hold that Defendant's Level 1 OC

spray training program is committed to agency discretion and not subject to judicial review.

### 4.        DOD Directive 3000.3 Is Not Arbitrary Or Capricious

Even assuming that DOD Directive 3000.3 is not committed to agency discretion,

Plaintiffs' APA claim (Count IV) still lacks merit because the Directive is not arbitrary and

capricious.  The D.C. Circuit has held that "[a]n agency's rule will be found arbitrary and

capricious 'if the agency has relied on factors which Congress has not intended it to consider,

entirely failed to consider an important aspect of the problem, or offered an explanation for its

decision that runs counter to the evidence before the agency or is so implausible that it could not

be ascribed to difference in view or the product of agency expertise." Advocates for Highway

and Auto Safety v. Federal Motor Carrier Safety Administration, 429 F.3d 1136, 1144-45 (D.C.

Cir. 2005) (internal citation omitted); The Ocean Conservancy v. Gutierrez, 394 F. Supp.2d 147,

155-56 (D.D.C. 2005) (Leon, J.).

Here, DOD Directive 3000.3 and its implementing manuals, OPNAVINST 5580.1A –

and later revised by OPNAVINST 5530.14D – have their genesis in the various federal statutes

passed by Congress establishing the Department of Defense and the Department of the Navy.

More particularly, Section 113 of Title 10 establishes the position of the Secretary of the

Department of Defense and provides that the Secretary is the principal advisor to the President in

all matters relating to the Department of Defense.  10 U.S.C. § 113(a) and (b).  Section1585

authorizes the Secretary to issue regulations regarding the carrying of firearms and other

appropriate weapons by civilian officers and employees. 10 U.S.C. § 1585 (stating that civilian

officers and employees of the Department of Defense may carry firearms or other appropriate

weapons).

Section §5013 of Title 10 provides that the Secretary of the Navy, subject to the

authority, direction and control of the Secretary of Defense, is responsible for all the affairs of

the Department of the Navy, including organizing, supplying, equipping, training and

maintaining the Navy.  10 U.S.C. § 5013.   The Secretary of the Navy is also responsible, under

the statute, for the functioning and efficiency of the Navy, and the formulation of policies and

programs that are fully consistent with national security objectives and policies established by

the President or Secretary of Defense. 10 U.S.C. 5013(c).

The interplay of these statutory provisions provides the Department of Defense with the

authority to issue DOD Directive 3000.3 to govern the "development and employment of non-

lethal weapons."  DOD Directive 3000.3, at § 1.1 (section <u>Purpose</u>).  In that connection, Chapter

4 of OPNAVINST 5580.1A implemented DOD Directive 3000.3 by setting the policy for the use

of force, including a requirement that "<u>the minimum amount of necessary force will be used in</u>

<u>all situations</u>."  OPNAVINST 5580.1A, Chapter 4, § 0403 (emphasis in original).  Chapter 4 also

lists the spectrum of force, from the least severe to the most severe.  Id. at Chapter 4, §0403.  The use of OC spray is listed on this continuum of force.  Id. at Chapter 4, §0403(d).  The training on the use of OC spray is also outlined in Chapter 4.  Id. at Chapter 4, §0403(d)(3).  In January 2007, the Department of the Navy issued OPNAVINST 5530.14D, which revised OPNAVINST 5580.1A and further expanded on the use and training of non-lethal weapons, including the use and training of OC spray.  See OPNAVINST 5530.14D, at Chapter 13.

Moreover, the Level I OC spray training is essential to the law enforcement duties because of the high probability of exposure to OC spray.  Lt. Col. Simpson Decl. at ¶ 11, 15.  Given the high probability of exposure, "the purpose behind [the OC spray training] is to teach the student how to fight through the contamination and to protect him or herself, and also to be aware of the effect of oleoresin capsicum spray."  Lt. Col. Simpson Decl. at ¶ 15.  Furthermore, the Level I OC spray training also teaches the students how to dissemble and assemble a service pistol while being exposed to the OC spray.  Lt. Col. Simpson Decl. at ¶ 11.  This is to teach a student how to protect himself or herself while being contaminated with the chemical.  Lt. Col. Simpson Decl. at ¶ 15.

Under these facts, the issuance of DOD Directive 3000.3 and its implementing manuals is not arbitrary and capricious but demonstrates that Defendant considered the authority given to it by Congress.[6]  Based on these statutes, Defendant designed policies and training manuals on the use of force, including the use of non-lethal weapons, that comport with the authority granted to

---

[6]     To the extent that the Complaint is alleging that the promulgation of DOD Directive 3000.3 violated the rule making process under the APA because the DOD did not provide for notice and time for public comment on the Directive, that claim also fails because the rule making procedure under the APA does not apply to military matters.  See United States v. Ventura-Melendez, 321 F.3d 230 (1st Cir. 2003).

it.  Accordingly, the Court should reject Plaintiffs' APA claims that the Level I OC spray

training program is arbitrary and capricious.

5.    The Agency's Action Did Not Exceed Statutory Authority

Plaintiffs conclusorily allege that subjecting the Individual Plaintiffs to Level I OC spray

training exceeds Defendant's statutory jurisdiction, authority, or limitations.  See Compl. at ¶

Count V.  Plaintiffs, however, fail to identify the statutory jurisdiction or authority that

Defendant purportedly violated or exceeded.  In fact, contrary to the allegations, the OC spray

training flows from the statutory scheme designed by Congress.

In determining whether an agency has exceeded its statutory authority, the court will use

the standards set out in Chevron v. Natural Resources Defense Council Inc., 467 U.S. 837

(1984).  Bluewater Network v. EPA, 370 F3d 1, 11 (D.C. Cir. 2004), see also, Doe v. Sullivan,

Secretary of Health and Human Services, 938 F.2d 1370, 1381 (D.C. Cir. 1991).  In Chevron, the

Supreme Court explained that the first question a court must consider is whether Congress has

spoken on the precise question at issue.  467 U.S. at 842.  "[I]f the statute is silent or ambiguous

with respect to the specific issue, the question for the court is whether the agency's answer is

based on a permissible construction of the statute."  Chevron, 467 U.S. at 842-43.  Considerable

weight and deference should be given to the agency's construction of the statutory scheme it is

entrusted to administer.  Id. at 844.

Here, the various statutes are silent on the specific development and employment of

force, including the use of non-lethal force, such as OC spray.  However, as discussed in Section

IV(A)(4) supra, the interplay of the various statutes broadly sets out the authority for the

Department of Defense and the Department of the Navy to promulgate and implement policies

18

necessary for the security of the nation.  In that vein, Defendant has promulgated a policy that will reinforce deterrence and expand the range of options on the use of force, including the use of non-lethal weapons, available to commanders. The non-lethal weapon option includes the use of OC spray.  Under these circumstances, DOD 3000.3 does not exceed any statute passed by Congress.

### B.    Count I through III: Plaintiffs' Fifth Amendment Claims.[7]

#### 1.    Count I: Substantive Due Process.

The Complaint alleges that the use of OC spray as part of the Defendant's training program violates Plaintiffs' Fifth Amendment substantive due process right because the training may cause injury to the Individual Plaintiffs and "shock the contemporary conscience."  Compl. at ¶ 39 (Count I).  However, Plaintiffs have failed to identify the specific substantive due process right that is allegedly being infringed upon.

"In reviewing substantive due process claims, the Supreme Court has instructed that there are two features to such a claim. 'First, [the Court has] regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.' "  Johnson v. Quander 370 F. Supp.2d 79, 89 (D.D.C. 2005) (quoting Washington v. Glucksberg, 521 U.S. 702, 720-21, (1997) (internal citations omitted).  Second, the Court requires "in substantive-due-process cases

---

[7]      As discussed in Section D *infra*, the Association Plaintiffs do not have standing to pursue Fifth Amendment claims in this case on behalf of its members.  However, assuming *arguendo* that they have standing, Defendant addresses the merit of both the Association Plaintiffs' and Individual Plaintiffs' Fifth Amendment claims in this Section.

a 'careful description' of the asserted fundamental liberty interest." Id. at 89 (internal citations omitted). Thus, the "[Fifth] Amendment 'forbids the government to infringe [on] ... 'fundamental' liberty interests [], no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." Id. (internal citations omitted).

Because of this high standard, substantive due process analysis must begin with a careful description of the asserted right. Reno v. Flores, 507 U.S. 292, 301-02 (1993). As the D.C. Circuit has noted, "substantive due process prevents governmental power from being used for purposes of oppression, or abuse of government power that shocks the conscience, or action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests." Washington Teachers' Union Local #6, American Federation of Teacher, AFL-CIO v. Brd. of Educ. of the District of Columbia, 109 F.3d 774, 781 (D.C. Cir. 1997).

Here, Plaintiffs have not articulated a fundamental right and liberty being infringed upon because of the OC training program. It is not disputed that the use of OC spray in the face during training will cause pain, redness, and other physical discomforts. That is the underlying purpose of the OC spray – to cause physical discomfort on the person being sprayed so that deadly force is not necessary. Lt. Col. Simpson Decl. at ¶ 7. However, experiencing physical discomfort as part of law enforcement training is hardly a violation of any fundamental right or liberty. In fact, Defendant is unaware of any case law discussing the use of OC spray as a form of training – or any other form of law enforcement training – that implicates an individual's constitutional right.

On the other hand, courts that examined the use of OC spray, within the context of allegations of excessive force used by an arresting officer, have concluded that the use of OC

spray was reasonable when the individual sprayed was either resisting arrest or refusing reasonable police requests.  See, e.g., Mecham v. Frazier, 500 F.3d 1200 (10th Cir. 2007)(use of pepper spray reasonable when subject failed to obey a direct order);  Wagner v. Bay City, Texas, 227 F.3d 316, 324 (5th Cir. 2000)( use of chemical spray objectively reasonable when suspect physically resisted arrest); Ludwig v. Anderson, 54 F.3d 465, 471 (8th Cir. 1995); Lawyer v. City of Council Bluffs, Iowa, 240 F. Supp. 2d 941, 953 (S.D. Iowa 2002), aff'd, 361 F.3d 1099 (8th Cir. 2004) (use of pepper spray not excessive even when crimes not serious).  See also Bloomer v. Rock Island Police Officers Williams,, 2007 WL 2684079 (C.D. Ill 2007) (use of pepper spray reasonable when bicyclist failed to obey orders and tried to ride off).

Since the use of OC spray has been upheld by federal courts as a reasonable use of force by police officers, it logically follows that the use of OC spray in training is also reasonable and does not "shock the contemporary conscience", or violate the Individual Plaintiffs' fundamental right or liberty.   Moreover, to the extent that some liberties are affected by Level I OC spray training, the training is sufficiently tailored to serve a compelling state interest: training civilian law enforcement officers on the use of non-lethal weapons to guard military installations. Without more, the Court should dismiss Plaintiffs' substantive due process claim (Count I) for failure to state a claim.

### 2.    Count II: Procedural Due Process.

The Complaint broadly alleges that the use of Level I OC spray as part of the training program violates the Individual Plaintiffs' procedural due process rights under the Fifth Amendment.  Compl. at ¶ Count II.  The key to a procedural due process violation is identifying what, if any, process is due.  Doe v. District of Columbia, 93 F.3d 861, 870 (D.C. Cir. 1996);

<u>Medina v. District of Columbia</u>, 517 F. Supp. 2d 272, 281 (D.D.C. 2007).  The "'[p]rocess is not

an end in itself,' but is rather a means to the end of protecting substantive rights."  <u>Doe</u>, 93 F.3d

at 870 (quoting  <u>Doe by Nelson v. Milwaukee</u>, 903 F.2d 499, 504 (7th Cir.1990)).

 Here, Plaintiffs' procedural due process claim is infirm because Plaintiffs fail to identify

what process is due and how Defendant effectively deprived Plaintiffs of their rights.[8]  Contrary

to the allegations, there is no process due Plaintiffs because the OC spray training program was

created pursuant to the DOD's statutory authority to arm civilian law enforcement officers.  <u>See</u>

10 U.S.C. § 1585.  Accordingly, Plaintiffs' procedural due process claim also fails as a matter of

law.

### 3. Count III: Equal Protection Clause.

 Plaintiffs allege that the OC spray training denies them equal protection under the law.

Compl. at ¶ Count III.   Generally speaking, to establish an equal protection claim, plaintiffs

must allege that the government intentionally discriminated against them as members of a

protected class or that they were treated differently than another similarly situated individual or

group.  <u>Forrester v. Federal Bureau of Prisons</u>, 2007 WL 2616916, *3 (D.D.C. 2007) ( citing

<u>Personnel Adm'r v. Feeny</u>, 442 U.S. 256 (1979), <u>Women Prisoners of District of Columbia Dept.</u>

<u>of Corrections v. District of Columbia</u>, 93 F.3d 910, 927 (D.C. cir. 1996)).

 Here, Plaintiffs fail to allege intentional discrimination because they belong to  a

---

 [8] OPNAVINST 5580.1A specifically states that "this instruction is not intended to
create any rights, substantive or procedural; it does not place limits on the lawful prerogatives of
Navy law enforcement personnel."  <u>See</u> OPNAVINST 5580.1A (section <u>Purpose</u>) (Gov. Exh. 2).
Similarly, OPNAVINST 5530.14D, which revised and expanded OPNAVINST 5580.1A, also
specifically states that, "[t]his instruction is not intended to create any rights, substantive or
procedural; it does not place limits on the lawful prerogatives of Navy security and law
enforcement personnel."  <u>See</u> OPNAVINST 5530.14D (section <u>Purpose</u>) (Gov. Exh. 3).

protected class or that they were treated differently than similarly situated groups. Specifically, the Complaint fails to allege that the Individual Plaintiffs (or even members of the Association Plaintiffs) belong to a particular protected class and that Defendant singled them out for intentional discrimination. On the contrary, it appears that members of the Association Plaintiffs are civilian law enforcement officers (Compl. at ¶ 16), that include both males and females; persons of all races; and persons both older than and younger than forty years of age. Suffice it to say, law enforcement officers are not a protected class of individuals. Moreover, Plaintiffs fail to identify another similarly situated group that has been treated differently. Without more, Plaintiffs' Count III fails as a matter of law.

### C.     The Association Plaintiffs' and Plaintiff Waters' Claims Are Time Barred.

Claims asserted by the Association Plaintiffs and Plaintiff James W. Waters are more than four and one-half years out of time or, at best, more than 18 months tardy.[9]  Pursuant to 28 U.S.C. §2401(a), every civil action against the United States must be filed within six years after the right of action first accrues. This time limitation applies equally to cases brought pursuant to the APA. See Impro Products, Inc. v. Block, Sec'y of Agriculture, 722 F.2d 845, 850 (D.C. Cir. 1983); Citizens Alert Regarding the Env. v. EPA, 259 F. Supp.2d 9, 25 (D.D.C. 2003). When dismissal is based upon a failure to meet the statutory time limit, dismissal is based upon lack of jurisdiction and not upon failure to state a claim. See Caraballo-Sandoval v. BOP, 1997 WL 195525

---

[9]     Messrs. Joseph Barbetta and Anthony began employment with Defendant on September 22, 2002, and September 2, 2003, respectively. Therefore, these two plaintiffs may not have knowledge of their cause of action until they began their employment, which fell within the six year statute of limitation. See, e.g., U.S. ex rel. Miller v. Bill Harbert Intern. Const., 505 F. Supp.2d 1, 8-9 (D.D.C. 2007) (absent fraudulent concealment, the statute of limitations began to accrue when plaintiffs became aware of their claims).

(D.C. Cir. Mar. 31, 1997) (citing Diliberti v. United States, 817 F.2d 1259, 1262-64 (7th Cir. 1987) (failure to file within the statute of limitations is jurisdictional, thus an untimely complaint deprives the district court of subject matter jurisdiction)).

Here, the policy that created the Level I OC training program began in July 1996, when the DOD issued DOD Directive 3000.3, which set forth the development and use of non-lethal weapons (which would include the use of OC spray). See DOD Directive 3000.3 (Gov. Exh. 1). The Association Plaintiffs existed since 1966 when they were chartered. See Gov. Exh. 5. Plaintiff James W. Water began his service with Defendant on October 7, 1983. Therefore, to the extent that the OC training causes harm to the Association Plaintiffs or Plaintiff Waters in any way, the six-year statute of limitations clock began to tick in July 1996. See, e.g., Harris v. FAA, 215 F. Supp.2d 209, 212 (D.D.C. 2002) (noting that "[p]ursuant to the APA, a cause of action first accrues when a plaintiff may challenge a final agency action in court."). Under 28 U.S.C. §2401(a), these plaintiffs' claims must be brought before July 2003; however, the Association Plaintiffs and Plaintiff Waters did not file this action until January 2008, approximately more than four and one-half years out of time.

Even assuming that DOD Directive 3000.3 did not give rise to any cause of action, OPNAVINST 5580.1A, issued in July 2000, that implemented the Directive would concretely give rise to Plaintiffs' claims. More particularly, on July 26, 2000, the Department of the Navy issued OPNAVINST 5580.1A to implement DOD Directive 3000.3 for purposes of law enforcement. See Gov. Exh. 2. OPNAVINST 5580.1A specifically applies to "military and civilian Navy personnel performing law enforcement." See OPNAVINST 5580.1A (Purpose section). Chapter 4 of OPNAVINST 5580.1A set forth guidelines on the use and training of

non-lethal weapons, including OC spray.[10]  Therefore, both Association Plaintiffs and Plaintiff

Waters knew or should have known as early as July 2000 of  the potential harm caused by the

OC spray training.  Under the statute of limitations, these plaintiffs had until July 2006 to file a

complaint, but they did not do so until January 2008, proximately 18 months out of time.  Under

these facts, the Court should dismiss these plaintiffs' claims as time barred.

### D.    Association Plaintiffs Lack Standing.

The Association Plaintiffs do not have standing to sue under the Fifth Amendment on

behalf of their members for the alleged injury caused by the OC training program because the

harm is too individualized.  An association, such as Association Plaintiffs, has standing to bring

a lawsuit when "(a) its members would otherwise have standing to sue in their own right; (b) the

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim

asserted nor the relief requested requires the participation of individual members in the lawsuit."

Internat't Union, United Automobile, Aerospace and Agricultural Implement Workers of

America, v. Brock, 477 U.S. 274, 282 (1986) (quoting Hunt v. Washington State Apple

Advertising Comm'n, 432 U.S. 333, 343 (1977)); see also Nat'l Treas. Employees Union v.

Chertoff, 452 F.3d 389, 477 (D.C. Cir. 2006).

Here, the Association Plaintiffs fail to meet the third prong of this test because the claims

are so individualized, it would be impossible to establish them without the involvement of the

individual members.  As a general rule, where the relief sought tends to be declaratory,

---

[10]    As discussed in Section IV(A)(2) *supra*, Plaintiffs inaccurately allege that
OPNAVINST 5530.14D approved the use and training of OC spray.  Compl. at ¶ 25. Rather, the
manual that implemented DOD Directive 3000.3 for law enforcement purposes on the use and
training on OC spray began with OPNAVINST 5580.1A, which was issued in July 2000.

injunctive or some other prospective relief, then the courts often find that an individual member of the association need not be a party to the litigation, and therefore the third prong is met.  See, e.g., Warth v. Seldin, 422 U.S. 490, 515 (1975).  However, when the alleged injury is peculiar to the individual members concerned, so that individualized proof is needed, then associational standing is generally not proper.  Id. at 515-16.

In this case, although the Complaint seeks declaratory and injunctive relief, Plaintiffs' Fifth Amendment claims would require individualized proof.  For instance, Plaintiffs' Fifth Amendment claims allege that Level I OC spray training creates an unreasonable risk of injury or death, and/or inflicting severe physiological and emotional injury to the Individual Plaintiffs. See Compl. at Counts I to III.  Proof showing that the OC spray training would cause physiological and emotional injury to the Individual Plaintiffs (or other members of the Association Plaintiffs) requires much more than a generalized claim.  Rather, it will require particularized testimony from the Individual Plaintiffs and other members of the Association Plaintiffs.  Proof of mental injury, as alleged, would require individual members to testify as to their respective state of mind.  Furthermore, the evidence of such an injury must also be supported by reports or medical records from their respective physicians.  According to the Complaint, these alleged physiological and mental injuries form the basis of Plaintiffs' Fifth Amendment claims.  Given that these claims are so particular to the individuals, the members' participation is indispensable and, therefore, as a matter of law, the Association Plaintiffs do not have standing to pursue Fifth Amendment claims on behalf of their members.

**V.     Conclusion.**

For the foregoing reasons, the Court should grant Defendant's Motion to Dismiss for

Lack of Subject Matter Jurisdiction and for Failure to State a Claim, and dismiss this case with

prejudice.

Dated: May 9, 2008.                          Respectfully Submitted,

                                              /s/   Jeffrey A. Taylor
                                             JEFFREY A. TAYLOR, D.C. BAR # 498610
                                             United States Attorney


                                              /s/   Rudolph Contreras
                                             RUDOLPH CONTRERAS, D.C. BAR #434122
                                             Assistant United States Attorney

                                              /s/   John C. Truong
                                             JOHN C. TRUONG, D.C. BAR #465901
                                             Assistant United States Attorney
                                             555 Fourth Street, N.W.
                                             Washington, D.C.  20530
                                             (202) 307-0406

                                             Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **FRATERNAL ORDER OF POLICE, D.C.** ) | |
| **LODGE 1, NDW LABOR COMMITTEE, INC.,** ) | |
| *ET AL.*, ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No: 08-0039 (RJL)** |
| ) | |
| **ROBERT M. GATES,** ) | |
| **Secretary, U.S Department of Defense,** ) | |
| ) | |
| **Defendant.** ) | |

_____)

ORDER

Upon consideration of Defendant's Motion to Dismiss for Lack of Subject Matter

Jurisdiction and for Failure to State a Claim, the Opposition thereto, and the entire record herein,

it is this ____ day of _____, 2008,

ORDERED that Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

and for Failure to State a Claim be and is hereby GRANTED; and it is

FURTHER ORDERED that the above-captioned action be and is hereby DISMISSED

with prejudice.

SO ORDERED.

_____
U.S. District Judge



Department of Defense
# DIRECTIVE

NUMBER 3000.3

July 9, 1996

ASD(SO/LIC)

SUBJECT: Policy for Non-Lethal Weapons

References: (a) Title 10, United States Code
(b) DoD Directive TS-3600.1, "Information Warfare (U)," December 21, 1992

## 1. PURPOSE

This Directive under reference (a):

1.1. Establishes DoD policies and assigns responsibilities for the development and employment of non-lethal weapons.

1.2. Designates the Commandant of the Marine Corps as Executive Agent (EA) for the DoD Non-Lethal Weapons Program.

## 2. APPLICABILITY AND SCOPE

This Directive:

2.1. Applies to the Office of the Secretary of Defense, the Military Departments (including the Coast Guard, when it is operating as a Military Service in the Navy), the Chairman of the Joint Chiefs of Staff, the Unified Combatant Commands, the Defense Agencies, and DoD Field Activities.

2.2. Applies to all non-lethal weapon development and acquisition programs and the employment of fielded non-lethal weapons.

2.3. In general, does not apply to command and control warfare or any other

1



military capability not designed specifically for the purpose of minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment, even though they may have these effects to some extent. However, for those matters involving information warfare, refer to reference (b).

## 3. DEFINITION

3.1. Non-Lethal Weapons. Weapons that are explicitly designed and primarily employed so as to incapacitate personnel or materiel, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment.

3.1.1. Unlike conventional lethal weapons that destroy their targets principally through blast, penetration and fragmentation, non-lethal weapons employ means other than gross physical destruction to prevent the target from functioning.

3.1.2. Non-lethal weapons are intended to have one, or both, of the following characteristics:

3.1.2.1. They have relatively reversible effects on personnel or materiel.

3.1.2.2. They affect objects differently within their area of influence.

## 4. POLICY

It is DoD policy that:

4.1. Non-lethal weapons, doctrine, and concepts of operation shall be designed to reinforce deterrence and expand the range of options available to commanders.

4.2. Non-lethal weapons should enhance the capability of U.S. Forces to accomplish the following objectives:

4.2.1. Discourage, delay, or prevent hostile actions.

4.2.2. Limit escalation.

4.2.3. Take military action in situations where use of lethal force is not the preferred option.

4.2.4. Better protect our forces.

4.2.5.  Temporarily disable equipment facilities, and personnel.

4.3.  Non-lethal weapons should also be designed to help decrease the post-conflict costs of reconstruction.

4.4.  The availability of non-lethal weapons shall not limit a commander's inherent authority and obligation to use all necessary means available and to take all appropriate action in self-defense.

4.5.  Neither the presence nor the potential effect of non-lethal weapons shall constitute an obligation for their employment or a higher standard for employment of force than provided for by applicable law.   In all cases, the United States retains the option for immediate use of lethal weapons, when appropriate, consistent with international law.

4.6.  Non-lethal weapons shall not be required to have a zero probability of producing fatalities or permanent injuries.   However, while complete avoidance of these effects is not guaranteed or expected, when properly employed, non-lethal weapons should significantly reduce them as compared with physically destroying the same target.

4.7.  Non-lethal weapons may be used in conjunction with lethal weapon systems to enhance the latter's effectiveness and efficiency in military operations.   This shall apply across the range of military operations to include those situations where overwhelming force is employed.


5.  RESPONSIBILITIES

5.1.  The Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict under the Under Secretary of Defense for Policy, shall have policy oversight for the development and employment of non-lethal weapons.

5.2.  The Assistant Secretary of Defense for Strategy and Requirements, under the Under Secretary of Defense for Policy, shall have policy oversight for the review of crisis action and deliberate plans, and shall ensure that the availability of non-lethal weapons is considered in their development.

5.3.  The Under Secretary of Defense for Acquisition and Technology shall have principal oversight responsibility for the DoD Non-Lethal Weapons Program,

including joint Service program coordination to help highlight and prevent duplication of development in both classified and unclassified programs.

5.4. The <u>Chairman of the Joint Chiefs of Staff</u> shall:

5.4.1. Advise the Secretary of Defense on development and employment of non-lethal weapons.

5.4.2. Assess military requirements for non-lethal weapons acquisition programs.

5.4.3. Monitor the development of Service non-lethal weapon programs.

5.4.4. Develop and promulgate joint doctrine, as appropriate, to incorporate emerging capabilities of non-lethal weapons.

5.5. The <u>Commanders of the Unified Combatant Commands</u> shall:

5.5.1. Ensure that procedures exist for the integration of non-lethal weapons into operational mission planning.

5.5.2. Identify the warfighting requirements of the Unified Combatant Commands.

5.6. The <u>Secretaries of the Military Departments</u> and the <u>Commander in Chief of the United States Special Operations Command</u> shall:

5.6.1. Ensure the development and implementation of employment concepts, doctrine, tactics, training, security procedures, and logistics support for fielded non-lethal weapons systems in accordance with policies defined in this Directive.

5.6.2. Ensure that a legal review of the acquisition of all non-lethal weapons is conducted. The review should ensure consistency with the obligations assumed by the U.S. Government under all applicable treaties, with customary international law, and, in particular, the laws of war.

5.6.3. Ensure that only those non-lethal weapon development programs that satisfy the general requirements of technical feasibility, operational utility, and policy acceptability are considered for support.

5.6.4. Consistent with existing guidelines on management of acquisition programs, establish guidelines to emphasize that non-lethal weapons must:

*DODD 3000.3, July 9, 1996*

5.6.4.1. Achieve an appropriate balance between the competing goals of having a low probability of causing death, permanent injury, and collateral material damage, and a high probability of having the desired anti-personnel or anti-materiel effects.

5.6.4.2. Not be easily defeated by enemy countermeasures once known; or if they could, the benefits of a single opportunity to use the weapon in a given context would be so great as to outweigh that disadvantage.

5.6.4.3. Achieve an effect that is worth the difficulty of providing the intelligence support required for mission planning and damage assessment.

5.6.5. Consistent with applicable security guidelines, provide program visibility to the Chairman of the Joint Chiefs of Staff and the Unified Combatant Commanders.

5.7. The <u>Secretary of the Navy</u> shall ensure that the Commandant of the Marine Corps serves as the EA for the DoD Non-Lethal Weapons Program. The EA shall be responsible for program recommendations and for stimulating and coordinating non-lethal weapons requirements.

5.8. The <u>Assistant Secretary of Defense for Command, Control, Communications, and Intelligence</u> shall:

5.8.1. Establish policy and provide direction for development of the necessary DoD informational and intelligence capabilities to enable effective use of non-lethal weapons.

5.8.2. Provide policy and guidance when non-lethal weapons matters involve DoD information warfare under DoD Directive TS-3600.1 (reference (b)).

5.9. The <u>Assistant Secretary of Defense for Public Affairs</u> shall coordinate and approve guidance on public affairs matters concerning non-lethal weapons and their use.

*DODD 3000.3, July 9, 1996*

6. <u>EFFECTIVE DATE</u>

This Directive is effective immediately.

John P. White
Deputy Secretary of Defense



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

IN REPLY REFER TO

OPNAVINST 5580.1A
N09N3
26 JULY 2000

OPNAV INSTRUCTION 5580.1A

From:  Chief of Naval Operations
To:    All Ships and Stations (less Marine Corps field
       addressees not having Navy personnel assigned)

Subj:  NAVY LAW ENFORCEMENT MANUAL

Ref:   (a) SECNAVINST 5511.36A

Encl:  (1) Navy Law Enforcement Manual

1. Purpose.  To detail procedures, provides guidance, and sets
forth standards for military and civilian Navy personnel
performing law enforcement duties; this instruction is not
intended to create any rights, substantive or procedural; it does
not place limits on the lawful prerogatives of Navy law
enforcement personnel.

    This instruction is a substantial revision and should be read
in its entirety.

2. Cancellation.  OPNAVINST 5580.1.

3. Discussion

    a.  The commanding officer is responsible for the good order
and discipline of the command.  Law enforcement personnel
assigned to the command's security department must have
standardized policies and procedures in order to enforce the law,
maintain good order and discipline, investigate offenses,
safeguard the rights of all persons, and provide service to the
community.

    b.  The language used is intended to separate recommended
measures from required actions.  Words which are directive in
nature, e.g., will, shall, must, etc., indicate that the measure
is mandatory.

GOVERNMENT
EXHIBIT
2

OPNAVINST 5580.1A
26 JUL 2000

c.  The requirements in this instruction apply to Navy law enforcement personnel of host activities providing law enforcement services to their activity, to include tenant activities.  Navy law enforcement personnel are composed of officer and enlisted active duty/reserve military members and civilian personnel, either permanently assigned or on temporary additional duty.

d.  The provisions of this instruction do not apply to the Naval Criminal Investigative Service.

4.  Responsibilities

a.  The commanding officer of each ship and station shall implement the law enforcement policies and procedures contained in enclosure (1), as directed by reference (a), and Section 797 of Title 50 U. S. Code.

b.  Echelon 2 commanders are responsible for inspecting subordinate commands for compliance with this Manual.

5.  Reports and Forms

a.  The reports contained in enclosure (1) are exempt from reports control per SECNAVINST 5214.2.B.

b.  Forms to be used by Navy security detachments/departments are listed in Appendix B.  These are the only forms authorized for use.

DAVID L. BRANT
Special Assistant for Naval
Investigative Matters and
Security

Distribution:
SNDL Parts 1 and 2

2

# CHAPTER 1

## THE SECURITY DEPARTMENT

0101.  <u>MISSION OF THE SECURITY DEPARTMENT</u>.  The security department fulfills not only a law enforcement requirement but is responsible for physical security and loss prevention as well.

    a.  The objectives of law enforcement are:

        (1) The protection of life and property

        (2) The enforcement of laws and regulations

        (3) The preservation of good order and discipline

    b.  By attaining these objectives, the security department will maintain a safe environment for command personnel, protect government property, and allow the command to perform its assigned mission.

    c.  Physical security and loss prevention matters are issued by reference (b).

0102.  <u>ORGANIZATION OF THE SECURITY DEPARTMENT</u>

    a.  The commanding officer has the responsibility for the safety and security of the command.  On installations with multiple commands, host/tenant agreements will define the specific responsibilities of law enforcement between the commands.

    b.  Law enforcement for an installation is the responsibility of the host/regional command.  Commanding officers of tenant activities will retain those internal physical security responsibilities unique to their commands.  Security officer duties are specified in references (b) and (c).

    c.  Commands/regions having a law enforcement and physical security mission will consolidate those functions in a single security department.  The security department will be under the supervision of a security officer who will generally (though not in all cases) report to the regional commander or commanding officer as appropriate.  The security officer is the principal staff officer to the command for law enforcement and physical security matters.  For security departments having a total combined strength (military and civilian, including contract security personnel) of 100 or more persons an assistant security officer/operations officer should be considered for assignment to run the

Enclosure (1)

OPNAVINST 5580.1A
26 JULY 2000

c. In addition to training specified in reference (b), law enforcement personnel will receive training in:

(1) crime prevention

(2) community policing.

d. Training available through the various agencies in the local civilian communities should be explored for use.

e. All security department personnel who operate emergency vehicles will receive the Department of Transportation Emergency Vehicle Operator Course (DOT EVOC), from a certified instructor, at least once every 3 years. The DOT EVOC curriculum is available from the Naval Safety Center; Code 42; 375 A Street; Norfolk, VA 23511-4399.

Enclosure (1)

OPNAVINST 5580.1A
26 JUL 2000

CHAPTER 4

USE OF FORCE AND WEAPONS POLICIES

0401.  GENERAL

a. There are varying degrees of force that may be justified in a law enforcement situation depending upon its gravity.  The escalation of force must be consistent with the need for the least amount of force required to resolve the situation.

b. Law enforcement/security personnel may only use that level of force necessary to control/stop unlawful resistance, and to prevent the commission of a serious offense involving violence and threatening death or serious bodily harm.

c. Use of force guidelines are applicable in overseas areas to the extent that they satisfy applicable provisions of international agreements or arrangements relating to law enforcement and security matters.

0402.  USE OF FORCE.  Use of force policies are set forth in reference (g).  All Navy law enforcement personnel will have a working knowledge of those policies.  Briefings on use of force polices will be given quarterly, acknowledged by signature, and entered in individual training records.

0403.  METHODS OF FORCE.  Commanding officers must ensure that Naval Security Forces are provided standard law enforcement equipment and trained in its use to ensure that the minimum force necessary is applied.  The minimum amount of necessary force will be used in all situations.  These methods/means are listed from the least severe to the most severe on the following continuum:

a. Verbal commands.  Issued in order to have persons comply with requests in non-threatening situations.  This might include asking disputants to separate or asking a subject to produce documents under legitimate circumstances, e.g., drivers license during a routine traffic stop.

b. Physical apprehension and restraint techniques, e.g., come-along holds, take-downs.

c. Handcuffs.  To be used for safe custody, for a limited period of time, and for the protection of law enforcement personnel as well as the detainee.

d. Riot Control Agents (RCA) (CS and Oleoresin Capsicum (OC)).  RCAs may be used to subdue, in self-defense, or protection of a third party, if circumstances warrant their use.

(1) If RCAs are used, personnel will receive medical attention as soon as possible.  A person who has been sprayed will not be released until he/she has been advised of the safety

OPNAVINST 5580.1A
26 JUL 2000

measures to be taken, or until medical treatment has been received.

(2) Use of OC Pepper Spray is authorized for use and complies with reference (g). Because it is environmentally safe, biodegradable, and produces rapid physiological reaction in low concentrations, OC spray is now preferred.

(3) Law enforcement personnel will not be issued chemical agents until they have been trained in their use and knowledgeable of safety precautions involved with chemical agents, including necessary medical treatment following its use. Because of the variety or products available, training will be tailored according to manufacturer's recommendations.

e. Police Batons. Police batons may be issued at command discretion provided appropriate training has been provided and documented. Commands should include manufacturers' prescribed training for the side-handled police baton and collapsible baton. It is permissible to provide local training for the standard police baton. Collapsible batons are now preferred for shipboard environment.

f. Military Working Dogs.

g. Other DoD-approved non-lethal weapons may be used.

h. Firearms. No firearms shall be drawn and readied for use unless actual force would be authorized under the circumstances and per established guidelines.

0404. ARMING LAW ENFORCEMENT PERSONNEL. The authority to arm law enforcement and security personnel is vested in the commanding officer by U. S. Navy Regulations, 10 U.S.C. 1585, and reference (h). In exercising this authority, the commanding officer will be guided by the following:

a. No person shall be armed unless qualified in the use of the firearm assigned. Qualification includes satisfying all the firing requirements of reference (h) and receiving a use of force briefing quarterly.

b. Personnel who fail to achieve/maintain the required proficiency may be assigned to duties which do not require the carrying of firearms.

c. Qualified personnel will be issued an Authorization to Carry Firearms form (OPNAV 5512/2), which must be in their possession while carrying a firearm.

OPNAVINST 5580.1A
26 JUL 2000

0405.  WEAPONS POLICIES

a. Personal weapons are not authorized to be carried by duty personnel.  Only government-owned weapons are permitted to be carried.

b. Weapons will not be carried off-duty.  Weapons will be issued for use on duty and will be stored in an approved security container at security headquarters when not required for duty.

c. Weapons may be carried off-base by security personnel when in a duty status, such as transporting prisoners, travel between activities, etc.  Security supervisors must insure compliance with applicable Federal and local statutes/Status of Forces Agreements.

d. Only ammunition obtained through the Navy supply system may be used in government-owned weapons.  Special ammunition, such as bird-shot, wad-cutters, etc., is strictly prohibited for law enforcement and physical security uses, but may be used by Game Wardens and for training.

e. The carrying of unloaded weapons by on-duty personnel is prohibited, except for safety reasons while on the firing range or while participating in training exercises.

f. When weapons are stored, weapons storage facilities will meet the requirements of reference (i).

g. Fully loaded weapons will be carried, per reference (h).  The decision to load weapons on board ships continues to rest with commanding officers based on their evaluation of current conditions.

h. Shotguns, when carried in a vehicle must be secured in an approved shotgun locking mount, or locked and secured in the patrol vehicle's trunk.

0406.  PRISONER HANDLING

a. Personnel will use the minimum force necessary to apprehend, detain, transport, and process violators.

b. Persons apprehended will be searched and restrained.  When restraining any subject with handcuffs or other devices, the hands will be behind the back unless approved "travel cuffs/waist chains" are used.  Handcuffs will be double-locked.

c. When transporting prisoners in vehicles:

(1) Prisoners will be secured in the vehicle by use of seat belts.  Offenders will not be handcuffed to any part of the vehicle.

Enclosure (1)

OPNAVINST 5580.1A
26 JUL 2000

    (2) Law enforcement personnel will not engage in vehicle pursuits, high speed, or erratic driving.

    (3) Law enforcement personnel will inspect the prisoner compartments of vehicles for contraband and weapons prior to and after each use, and will search prisoners prior to placing them into a vehicle for transport.

    (4) When prisoners or suspects are to be transported by a person of the opposite sex, the driver will notify the dispatcher of the vehicle's mileage before starting the transport, and a record of the time and mileage will be recorded in the Desk Journal. Upon arrival at the destination, the dispatcher will again be notified of the ending mileage, and the time and mileage will be recorded in the Desk Journal. When possible, another patrol officer should ride in the transporting vehicle or follow in a vehicle directly behind.

0407. <u>DETENTION CELLS</u>. The operation of detention cells is the responsibility of the security officer. When a detention cell is available, the following standards will apply:

    a. Detention cells must be certified per reference (j), which specifies the requirements for processing of detainees and prisoners.

    b. Standard operating procedures will be prepared.

    c. Only designated personnel will be allowed into the detention cell area. Personnel working in the area will not be armed with any weapon, including firearms, riot control agents, batons, or other such devices unless in the performance of duties such as during prisoner disturbance.



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, D.C. 20350-2000

IN REPLY REFER TO

OPNAVINST 5530.14D
N3AT

JAN 3 0 2007

OPNAV INSTRUCTION 5530.14D

From:  Chief of Naval Operations

Subj:  NAVY PHYSICAL SECURITY AND LAW ENFORCEMENT

Encl:  (1) Navy Physical Security and Law Enforcement Manual

1.  _Purpose_.  To issue policy, identify responsibilities and set
forth standards for security and law enforcement operations
within the Navy.  This instruction is not intended to create any
rights, substantive or procedural; it does not place limits on
the lawful prerogatives of Navy security and law enforcement
personnel.

2.  _Cancellation_.  OPNAVINST 5530.14C and OPNAVINST 5580.1A.
This instruction is a complete revision and must be reviewed in
its entirety.

3.  _Scope_

    a.  The policies herein pertain to preventing or mitigating
hostile actions against personnel, resources and facilities, and
therefore fall within the domain of security and law
enforcement.  Enclosure (1) addresses security and law
enforcement policy for safeguarding personnel, property, and
material and enforcing rules and regulations at Navy
installations, activities, and afloat/operational commands.
However, information, personnel, and industrial security are not
within the scope of this instruction.  While security measures
that will deter, detect, delay, and defend against terrorist
attack are addressed, such measures are included with the
purpose of protecting against any act designed to impair the
Navy's effectiveness and are not specifically delineated to
combat the terrorist threat.

**GOVERNMENT
EXHIBIT
3**
CARDED 800-782-0099

OPNAVINST 5530.14D

JAN 3 0 2007

b.  Where this instruction conflicts with Combatant Commander security requirements, the Combatant Commander's requirements take precedence.  A waiver/exception is not required.

4.  Discussion

a.  The objectives of this instruction are:

(1) To establish policy for the safety and security of personnel and property.

(2) To provide guidance and set forth standards for military and civilian Navy personnel performing security and law enforcement duties.

(3) Protect Navy forces and assets from criminal activity.

b.  For purposes of brevity the term commander has been used throughout this instruction, and such use includes Type Commanders, Fleet Commanders, Regional Commanders, Installation/Ship/Squadron/Activity Commanding Officers, directors, facility managers, officers in charge, etc.

c.  The policy language used in this instruction includes:

(1) Mandatory policies that are directive in nature and provide standards, measures or actions that are required, and subject to inspection by higher headquarters and the Naval Inspector General (IG).  An inability to meet these requirements necessitates a request for a waiver or exception in accordance with the process outlined in Appendix XIII of the enclosure. These statements include the words "shall, will, or must."

(2) Recommendations while not mandatory in nature provide a framework that better support the mandatory policies, but are not within the purview of this instruction to mandate. Recommended procedures include the word "should."

(3) Enabling procedures permit actions or measures within described parameters.  These are not requirements, but are offered as possible actions or measures to take at the discretion of the responsible party.  These statements include the words "may or can."

2

OPNAVINST 5530.14D

JAN 3 0 2007

(4) Prohibitive procedures limit an individual's or command's authority to take actions or implement measures. These statements include terms such as "should not" if the action is advised against but left to the responsible party's judgment; or "shall not, will not, or may not" if the action is prohibited without prior authorization from an appropriate authority.

5. _Applicability_. This instruction is applicable to all Navy ships, shore activities, installations, reserve components, and all Navy military, civilian personnel employed or located thereon.

6. _Responsibilities_

a. The Chief of Naval Operations (CNO (N3N5)) is responsible for formulation and dissemination of Navy security policies.

(1) Branch Head, Antiterrorism and Force Protection (AT/FP) (CNO (N3AT)) under the Director, Information, Plans and Security (CNO (N3IPS)) is the focal point for Antiterrorism (AT) and coordinates AT and security matters as it relates to Naval operations.

(2) Exercises authority on behalf of the CNO as the program manager for Navy physical security and law enforcement. CNO (N3AT) is responsible for developing law enforcement policy and overseeing its implementation.

b. Director, Naval Criminal Investigative Service (NCIS) is assigned coordination and program management responsibilities for law enforcement programs and shall provide advice and assistance to commanders to enable them to develop and maintain effective programs. NCIS is responsible for managing the Navy's FBI National Academy quotas.

c. The Naval Inspector General (IG) shall ensure reviews are conducted as part of the Navy command inspection program, to determine compliance with the requirements contained in this instruction.

d. U.S. Fleet Forces Command:

(1) The Commander, U.S. Fleet Forces Command (CUSFFC) is

3

OPNAVINST 5530.14D

JAN 3 0 2007

designated as CNO Executive Agent (EA), as defined in Joint Pub 1, for Navy Force Protection in the U.S. Northern Command (USNORTHCOM) Area of Responsibility (AOR). The following specific responsibilities and authorities are inherent in the CFFC AT/FP EA role:

(a) Control and execution of the operational AT/FP mission for all Navy units, activities and facilities.

(b) Establish overarching, unified, command and control relationships and command responsibilities for execution of the Navy's AT/FP mission throughout the USNORTHCOM AOR.

(c) Define for the purposes of Navy (AT/FP) geographic battlespace boundaries and responsibilities of the CONUS regions, and the commanders of Second and Third fleets.

(d) Recommend changes to AOR/Baseline Force Protection Condition (FPCON) and measures to USNORTHCOM; determine and establish FPCON measures for Navy forces throughout the AOR.

e. Naval Component Commanders shall:

(1) Provide tactical control and execution of the operational AT/FP mission for all Navy activities and facilities within their area of responsibility.

(2) Ensure deployment training supports combatant commander requirements.

(3) Establish AT/FP readiness criteria and standards within the combatant commander and Navy requirements.

(4) Coordinate AT planning and reporting.

f. Commander Navy Installations Command (CNIC) shall:

(1) Serve as the single responsible claimant for CONUS base operations support for shore installation management.

(2) Oversee funding, deliver installation services, and implement efficiencies through Administrative Control (ADCON) of the Navy's Regions.

4

OPNAVINST 5530.14D

JAN 3 0 2007

(3) Provide unified and consistent procedures, standards of service, and practices for efficient management of installation support.

(4) Coordinate planning and budgeting for all regions and shore installations.

(5) Develop, manage, and distribute Ashore Navy Security Force (NSF) Table of Equipment (TE).

(6) Implement within CNIC instructions: Duties of Operations Jobs, Investigation Jobs, Protective Service Operator, Independent Duty Master-At-Arms and Training jobs.

g. Commander Navy Expeditionary Combat Command (COMNECC) shall:

(1) Serve as the Master at Arms (MA)/Security Force Subject Matter Expert (SME) concerning MA employment in support of Combatant Commander, Naval Component Commander and Service requirements.

(2) Develop and Coordinate MA Training Policy and execution.

(3) Develop and Coordinate Standardized MA tactics, techniques, and procedures; standard operating procedures, post orders, Navy Warfare Publication development, equipment, manpower/manning strategies, and metrics.

(4) Serve as the Military Working Dog (MWD) Program Manager.

h. Commander Navy Education and Training Command shall:

(1) Review physical security, law enforcement and AT course curricula to ensure commonality, and implement new training when changes in policy affect training delivered.

(2) Maintain the Distance Learning Site.

i. The Naval Facilities Engineering Service Center (NFESC), under Naval Facilities Engineering Command (NAVFAC) is the Navy's Physical Security Equipment (PSE) Program Manager and execution agent. NFESC shall:

OPNAVINST 5530.14D

JAN 3 0 2007

    (1) Identify major elements within the physical security equipment program.

        (a) Participate and/or lead program reviews when required.

        (b) Function as the ashore PSE program technical authority and procurement contracting office.

    (2) Manage and execute the physical security equipment program.

    (3) Coordinate with CNO, CFFC, CNIC, and customers to identify all projects, for each program element, each Fiscal Year.

    (4) Coordinate with NAVFAC to establish the budget necessary for each element within the program to include:

        (a) Project design.

        (b) Equipment or system procurement.

        (c) Installation.

        (d) Research development, testing and evaluation.

        (e) Life cycle support for equipment installed under this program.

    (5) Leverage the abilities of other organizations or systems commands in order to provide the "best value" solution in executing various functions of the program.

    (6) Manage and allocate the program funding as needed.

  j.  The Center for Security Forces (CENSECFOR) shall:

    (1) Partner with fleet representatives to define individual human performance requirements for NSF tasks and deliver the appropriate tools and opportunities to meet fleet requirements.

    (2) Coordinate with the Naval Warfare Development Command to ensure that training and doctrine are complementary and consistent.

OPNAVINST 5530.14D

JAN 3 0 2007

(3) Develop and deliver AT, LE and Expeditionary Security Force learning solutions in support of afloat and ashore expeditionary and NSF based upon CNO policy and validated CNIC/CFFC/TYCOM/fleet individual training requirements.

k.  Regional Commanders shall:

(1) Evaluate the security programs of subordinate activities, including headquarters commands, and ensure compliance with this instruction.

(2) Ensure Navy installation commanders are conducting self-assessments annually.

(3) Organize and manage the security organization into an integrated regional force to ensure continuity of purpose in providing effective defense of installations and associated areas of responsibility.  Regionally integrated, the duties of the commander below also apply.

l.  Commanding officers of Installations, Ships, Squadrons and Units shall:

(1) Implement the security and law enforcement policies and procedures contained in enclosure (1), and Section 797 of Title 50 U.S. Code.

(2) Report to the Regional Commander in whose area of responsibility they are physically located for all operational matters relating to AT/FP.  For units conducting a visit outside the Regional Commander's area of responsibility, report to the Numbered Fleet Commander.  Commanding Officers of tenant activities will coordinate AT/FP requirements with the host installation (or region) commander.

(3) Integrate all security and law enforcement forces at installations into a single force structure.  Tenant activities are not authorized to establish a separate armed security and law enforcement force without approval from CNO (N3AT).

(4) The installation commander is responsible for installation perimeter and area security, including coordination with tenant activities.

OPNAVINST 5530.14D

JAN 3 0 2007

(5) Establish an installation physical security program, to include the publication of an AT plan. AT plans must incorporate the pertinent plans of all tenant commands of the installation or region.

(6) Appoint a Security Officer in writing, directing that requirements of this manual be implemented.

(7) Publish a consolidated list of all restricted areas aboard the installation, including those of tenant commands. This list will be published annually and will specify whether or not these areas contain assets that are vital to national security, are inherently dangerous or contain critical infrastructure, the damage to which would create an imminent danger of death or serious bodily harm.

(8) Ensure that adequate security and law enforcement training is conducted for all security force personnel, per this instruction, and other applicable directives, instructions and regulations.

(9) Provide NSF with mission objectives based on Region/Command requirements and Navy Mission Essential Task lists (NMETLS).

m.  The commander of any Navy activity not physically located on a Navy installation shall report to the Navy regional commander in whose area of responsibility the command is physically located for all operational matters related to Navy AT/FP.

n.  Activity commanders are responsible for physical security of their activities.  Commanders shall provide sufficient resources to implement, manage and execute an effective security program.

o.  The Naval Inspector General, Chief of Naval Operations (CNO (N3AT)) and Echelon 2 commanders are responsible for inspecting subordinate commands for compliance with this instruction.

7.  <u>Reports and Forms</u>

a.  The reports contained in enclosure (1) are exempt from reports control per SECNAVINST 5214.2.B, "Department of the Navy (DON) Information Requirements (REPORTS) Management Program."

OPNAVINST 5530.14D

JAN 3 0 2007

b.  Forms to be used by Navy security units can be obtained at:  Navy forms online (https://forms.daps.dla.mil) and DoD forms site http://www.dtic.mil/whs/directives/infomgt/forms/formsprogram.htm). Forms to be used by Navy Security Detachments/Departments are listed in Appendix XXI.  These are the only forms authorized for use.

c.  Naval Criminal Investigative Service Headquarters will furnish, upon request sufficient quantities of FD 249 fingerprint cards, and further guidelines for submission of criminal history data.  Address requests for supplies and the guidelines for preparation of Criminal Justice Information Services Division, Fingerprint Cards to:

      Naval Criminal Investigative Service
      716 Sicard Street SE Suite 2000(Code 11B)
      Washington Navy Yard, DC 20388-5380

      J. G. MORGAN, JR.
      Vice Admiral U. S. Navy
      Deputy Chief of Naval
      Operations (Information,
      Plans, and Strategy)


Distribution:
Electronic only, via Department of the Navy Issuances Website
http://doni.daps.dla.mil

9

OPNAVINST 5530.14D

JAN 3 0 2007

CHAPTER 13

## USE OF FORCE AND WEAPONS POLICIES

1300. <u>General</u>. It is Navy policy that the NSF shall use only that force which is reasonable, given the facts and circumstances known at the time of the event to effectively bring an incident under control.

a. NSF may only use that level of force necessary to control or stop unlawful resistance, and to prevent the commission of a serious offense.

b. Use of force guidelines are applicable in overseas areas to the extent that they satisfy applicable provisions of international agreements, Status of Forces Agreements (SOFA), MOA, or arrangements relating to law enforcement and security matters, and established ROE.

c. Commanders shall ensure that NSF are provided standard security or law enforcement equipment and trained in its use to ensure that the minimum force necessary is applied.

d. NSF shall meet all qualifications to stand the post prior to assuming the duty, including current weapons qualification on the assigned weapon(s).

e. NSF who regularly performs law enforcement and security duties shall be armed. No person will be armed unless currently qualified in the use of assigned weapons. NSF members will carry a fully loaded weapon and possess at least two full reloads of additional rounds of ammunition (except shotgun) readily available on the person. Weapons carrying conditions are fully explained in reference (f). The carrying of unloaded weapons by on-duty personnel is prohibited, except while on the firing range or during approved training exercises.

f. NSF performing duties in direct support of nuclear weapons security or special nuclear material shall be guided in the use of deadly force by reference (as).

1301. <u>Use of Deadly Force</u>. Use of deadly force policies are set forth in references (ad) and (as).

a. All NSF personnel will have a working knowledge of those policies, as well as, a demonstrated capability on the application of force as outlined in the continuum of force

OPNAVINST 5530.14D

JAN 3 0 2007

below.  Training on use of force polices will be given
quarterly, acknowledged by signature, and entered in individual
training records.

b.  The principles on the use of deadly force with
firearms will be applied equally to the use of any weapon or
equipment which, when properly employed in their intended
application, could result in deadly force.

1302.  Continuum of Force.  The minimum amount of necessary
force will be used in all situations.  The following use of
force continuum is designed to provide an overview and visual
representation of the force options available to NSF.  It is a
fluid instrument, which attempts to embody the dynamics of a
confrontation.

a.  The standard for evaluating NSF use of force shall be
the reasonableness under the facts and circumstances known to
the guard or patrol officer at the time.

b.  A number of factors should be taken into
consideration when NSF select force options, and when commands
evaluate whether NSF have used reasonable force.  Examples of
factors that may affect NSF force option selection include, but
are not limited to:

(1) Subject factors (age, size, relative strength,
skill level, injury/exhaustion, number of patrol officers versus
number of subjects).

(2) Influence of drugs or alcohol.

(3) Proximity to weapons.

(4) Availability of other use of force options.

(5) Seriousness of the offense in question.

(6) Other urgent circumstances.

c.  NSF need not attempt to gain control over an
individual by use of the lowest level of force on the continuum
when reason dictates and the patrol officer can articulate that
a higher level of force is reasonable.  Likewise the skipping of
steps may be appropriate given the resistance or circumstance
encountered.

OPNAVINST 5530.14D

⌈JAN 3 0 2007

d.  The following category descriptions are non-exclusive and are intended to serve as illustrations of actions, which fall within the various levels.

e.  Actions of subject (as reasonably perceived by the patrol officer or based on the patrol officer's reasonable perception) include:

(1) Cooperative: Subject is cooperative and complies with verbal commands or other directions.  The likelihood of a physical response by the subject is low.  The subject can be controlled through the presence of NSF and verbalization skills.

(2) Non-Responsive or Uncooperative: Subject fails to respond to verbal commands or other directions.

(3) Passive or Low Level Resistance: Subject is passively or defensively resisting a patrol officer's authority and direction.  Includes verbal or physical cues of non-compliance.  Requires some degree of physical contact in order to elicit compliance.

(4) Active Resistance or Aggression: Subject exhibiting physical defiance and is attempting to interfere with the patrol officer's actions by inflicting pain or physical injury to the patrol officer without the use of a weapon or object.

(5) Assault or Threat of Assault: Subject assumes a fighting stance, charges a patrol officer or verbally or physically indicates intent to commit an assault.

(6) Life Threatening Assault or Assault Likely to Cause Great Bodily Harm: Subject commits an attack using an object, a weapon, or an empty hand assault, wherein the patrol officer reasonably believes that the assault will result in serious physical injury and/or death.

f.  Response Options include:

(1) Professional Presence, Verbalization, and Restraining and Detaining:

(a) Includes display of authority as a patrol officer/sentry and such non-verbal means of communication as body language, demeanor, and manner of approaching.

13-3

OPNAVINST 5530.14D

JAN 3 0 2007

(b) Verbalization involves the direction, and commands given to the subject.

(c) Restraining and detaining includes a patrol officer laying hands on a subject with the intention of gaining control of the subject. Also included in this level would be the application of temporary restraining devices such as handcuffs and leg restraints.

(2) <u>Compliance Techniques</u>: Includes joint manipulations, pressure point applications, take-down type techniques and the use of intermediate weapons in control type configurations.

(3) <u>Intermediate Force</u>: Includes chemical agents such as oleoresin capsicum based products; the use of impact weapons in an impact mode, and the use of personal weapons such as hands, feet, elbows and knees to strike a subject.

(4) <u>Lethal Force</u>: Includes the use of a firearm or any force, which has a reasonable likelihood of causing death or serious bodily harm.

(a) When a firearm is discharged, it will be fired with the intent of rendering the person at whom it is discharged incapable of continuing the activity or course of behavior prompting the individual to shoot.

(b) When operating under the Standing Rules for the Use of Force, warning shots are not authorized within U.S. territorial sea, except as permitted below. Warning shots from U.S. Navy and Naval Service vessels and piers within the U.S. territorial sea and U.S. internal waters are authorized when in the appropriate exercise of force protection of U.S. Navy and Naval Service vessels, they are fired:

(1) Over water toward an approaching vessel.

(2) When a clear line of fire exists.

(3) From a crew served weapon or rifle.

(4) By personnel certified under a training program approved by the Secretary of the Navy.

(5) Under tactical direction of competent authority.

OPNAVINST 5530.14D

JAN 3 0 2007

     (6) When there are no other means reasonable available to determine the intent of the approaching vessel without increasing the threat to U.S. Navy and Naval Service vessels and personnel.

     (c) Shots will not be fired if they are likely to significantly increase the danger to innocent bystanders, except as provided in reference (bb).

1303. <u>Non-Lethal Weapons</u>. NSF personnel may be armed with weapons or equipment other than firearms that, even though their intended purpose is non-lethal, when applied they could cause death or serious bodily harm. Reference (bc) pertains.

     a. The possession of NLW will not limit NSF personnel so equipped from utilizing deadly force. Neither the presence nor the potential effect of NLW shall constitute an obligation for their employment or a higher standard for employment of force than provided in reference (ad).

     b. The use of NLW will not be required to have a zero probability of producing fatalities or permanent injuries. However, while complete avoidance of these effects is not guaranteed or expected, when properly employed, NLW should significantly reduce them. The following provisions apply:

     (1) <u>Handcuffs</u>. Handcuffs will be securely fashioned, but not so tightly as to cause the individual injury or pain. Handcuffs, when in use, will be double locked and checked periodically to ensure they are not causing injuries. Suspects will not be handcuffed to vehicles. Handcuffing to other objects, such as interrogation desks, should only be considered when the suspect is deemed to be a danger to themselves or the interviewer. These precautions are also applicable to the use of flex cuffs and leg irons.

     (2) <u>Batons</u>. NSF personnel will be trained in the Target areas of the human body. Those areas are GREEN, YELLOW, and RED, with RED being the highest degree which could cause death or serious bodily injury. Issuance of a baton will be authorized only after formal training. Expandable batons are preferred.

1304. <u>Riot Control Agents (RCA) and Oleoresin Capsicum (OC) Spray</u>. NSF may use RCAs to subdue a subject when used in self-

OPNAVINST 5530.14D

JAN 3 0 2007

mandatory and usually not necessary to afford subjects immediate medical attention. A person who has been sprayed will not be released until they have been advised of the safety measures to be taken, or until medical treatment has been received.

f. NSF personnel will not be issued chemical agents until they have been trained in their use and have demonstrated a knowledge of safety precautions involved with chemical agents, including necessary medical treatment following its use. Training will be in accordance with the Inter-service Non-lethal Individual Weapons Instructor Course.

g. Manufacturer's instructions combined with the direction outlined herein should be followed whenever employing OC spray.

h. OC spray may be used only when the use of such force is necessary and reasonable under the circumstance at the time. OC may be used only in the degree/amount reasonably necessary to achieve a lawful purpose (limited to minimal amount necessary to establish control of the offender).

i. OC may only be used (never displayed/used inappropriately) upon consideration of all relevant circumstances such as wind direction and speed, the bystander's presence, whether the suspect is operating a motor vehicle, on a rooftop, or other situation where the subject's debilitation from OC spray would cause an unreasonable danger to themselves or others.

j. OC spray will not be used for the purpose of aiding an interrogation, punishment, or causing unnecessary pain or discomfort.

k. OC spray will not be used in an enclosed environment such as aboard an aircraft or automobile. Extreme caution should be used when considering use within an interior compartment aboard a ship. Department of Transportation regulations prohibit the carrying of OC spray aboard aircraft.

l. OC spray may be used against aggressive or threatening animals when no other reasonable alternative is available, providing the amount used is as humane as possible and fitting the circumstances.

m. Use of OC spray on foreign installations is subject to SOFA with host nation. Commanders should consult their SJA

OPNAVINST 5530.14D

JAN 3 0 2007

for clarification on any issues pertaining to location (CONUS/OCONUS) and ensure the use of OC spray is not in violation of existing local laws or agreement.

n.  OC spray is considered a RCA and its use in war is subject to limitations imposed by the chemical weapons convention.  The Armed Forces of the United States are prohibited from using any RCAs in war unless the President approves such use in advance.  All use of force including the use of RCAs, whether in war or operations other than war, must be in consonance with the rules of engagement or use of force policy applicable to that operation.  The use of RCAs outside a war zone is authorized as prescribed for peacetime.

o.  During peacetime, RCAs may be used on United States bases, posts, embassy grounds, ships, and installations for protection and security purposes, riot control, and evacuation of United States noncombatants and foreign nationals.  The United States controlled portions of foreign installations are considered United States installations.

p.  NSF law enforcement personnel for the performance of law enforcement activities may use OC spray:

    (1) On-base.

    (2) Off-base, when authorized by exception to Posse Comitatus Act, Section 1385 of Title 18, United States Code in the United States and its Territories and Possessions.

    (3) On-base overseas.

    (4) Off-base overseas in those countries where such use is specifically authorized by the host-nation government.

    (5) Off-base (worldwide) for the protection or recovery of nuclear weapons under the same conditions as those authorized for the use of lethal force.

    (6) In training.

q.  The employment of OC spray is coupled with the requirement to provide first aid to the subject sprayed with OC when reasonable.

OPNAVINST 5530.14D

JAN 3 0 2007

r.  Commands will report any OC attributed adverse effect sufficient to require treatment by a medical provider to CNO (N3AT).

1305.  Military Working Dogs (MWD).  Per reference (w), MWDs trained to attack (i.e., Patrol, Patrol/Drug Detector and Patrol/Explosive Detector Dogs) must be considered a weapon.

a.  When releasing an MWD to attack, the handler must:

(1) Be sure that the MWD will cease an attack upon command.

(2) Be sure that the MWD has identified the same target that the handler is releasing it to attack.

(3) Warn bystanders to cease all movement.

(4) Call the MWD off the attack as soon as the suspect stops or indicates surrender.

b.  MWDs will not be released to attack:

(1) If no suspect is in sight.

(2) In areas where children are present, except as a last resort short of the use of a firearm.

(3) Into a crowd of people.

1306.  Use of Force Notification and Procedures.  NSF shall immediately notify their supervisor whenever a level of force above the "Restrain/Detain" level of force is used, or concerning any incident in which an injury or complaint of injury occurs during the course of contact with a subject, unless urgent circumstances delay the notification.

a.  NSF shall obtain medical assistance for subjects who have sustained injuries or complaint of injury, or who have been rendered unconscious.

b.  NSF shall document the use of force in detail in the narrative section of the Incident Report.

c.  Upon being notified of an incident involving NSF use of force, supervisors shall:

OPNAVINST 5530.14D

JAN 3 0 2007

(1) Assess the incident, conduct an investigation, collect evidence, and ascertain witness information.

(2) Promptly prepare a memorandum outlining the circumstances of the use of force, and send it via chain of command to the Security Officer.

(3) Ensure that all reports have been completed and submitted.

## 1307. Arming Naval Security Force Personnel

a. The authority to arm NSF personnel is vested in the Commander by references (bd) and (ad) or, in overseas locations, as governed by Status of Forces Agreements. All NSF regularly engaged in law enforcement and security duties shall be armed when actually engaged in such duties. Once the determination is made to arm, weapons will be carried loaded in accordance with reference (e).

b. No contract guard will bear firearms on board a Navy installation or activity until written certification of qualification meeting Navy standards is provided by the contractor, and the guard has successfully completed training in the use of force and rules of engagement where applicable. In addition, contractors must comply with provisions prescribed by the State/Country in which the contract is administered, including current licensing and permit requirements, as needed for the individual or company based on the use of deadly force criminal/ civil liabilities.

c. Prior to issuing any firearm or ammunition to any individual, the issuing activity will require that the individual execute a DD Form 2760, in accordance with the domestic violence misdemeanor amendment. Refusal to execute a DD Form 2760 will result in a denial of access to Navy firearms and ammunition. Qualified personnel will be issued an Authorization to Carry Firearms form (OPNAV 5512/2), which must be in their possession while carrying a firearm.

## 1308. Weapons Policies

a. NSF shall not use, carry, or have in their possession, personal weapons while in the performance of assigned duties. NCIS Special Agents are authorized to carry non-government issued handguns for use in the performance of duties as granted in reference (ad).

OPNAVINST 5530.14D

JAN 30 2007

b.  NSF shall not carry their government-owned weapons when off-duty nor shall they keep government-owned weapons in private residences, either on or off the installation. Government-owned weapons will only be stored in approved security containers or armories per reference (i).  Weapons must be returned to approved storage after completion of duty or training.

c.  NSF may carry their government-owned weapons off base when in a duty status.  Security supervisors must insure compliance with applicable Federal and local statutes and Status of Forces Agreements.

d.  NSF shall use only ammunition obtained through their Navy supply sources in government-owned weapons.

e.  NSF shall not carry unloaded weapons while on-duty, except for safety reasons while on the firing range or while participating in training exercises.

f.  When NSF weapons are stored, weapons storage facilities will meet the requirements of reference (i).

g.  NSF vehicle patrols shall secure shotguns and other authorized long arms in an approved locking mount, or secured in the patrol vehicle's locked trunk.

h.  NSF should not draw their sidearm unless:

(1) There is a reason to believe that it might be needed to protect his or her life or that of another.

(2) Urgent circumstances exist that create a reasonable expectation that deadly force may become necessary under the circumstances.

i.  Anytime NSF personnel draw their weapon, they shall fully document the circumstances in accordance with the Unit's Rules, Regulations, and Procedures (RRP).

j.  Loss or theft of firearms will be reported as follows:

(1) NSF personnel shall immediately report the loss or theft of a duty weapon to their patrol/post supervisor or watch commander.

OPNAVINST 5530.14D

JAN 30 2007

(2) Discovery of a loss or theft of a NSF weapon from Ready for Issue (RFI) storage area will be immediately reported to the senior NSF supervisor on duty.

(3) Upon receiving the report of a lost or stolen weapon, the senior NSF supervisor on duty will ensure that appropriate RRP are followed regarding initial investigation and notification.

k.  NSF shall report any discharge of a firearm, other than authorized training, or any instance of mishandling of firearms by NSF personnel, to their supervisor or watch commander, who will ensure that appropriate RRP are followed regarding initial investigation and notification.  All such instances of discharge or mishandling shall be reported to the Naval Safety Center.

l.  Government credentials and badges do not entitle NSF members to carry a weapon in an off duty status.

1309.  Security Unit Arms Room Operations.  Security Ready For Issue (RFI) arms rooms will be operated in compliance with the current edition of reference (i).  Only security weapons, ammunition and equipment will be stored in the security RFI.

1310.  Prisoner Handling

a.  NSF will use the minimum force necessary to apprehend, detain, transport, and process violators.

b.  NSF should restrain and search all apprehended personnel.  When restraining any subject with handcuffs or other devices, the hands will be behind the back unless approved "travel cuffs/waist chains" are used.  Handcuffs will be double-locked.

c.  When transporting prisoners in vehicles NSF shall:

(1) Secure prisoners in the vehicle by use of seat belts.  Offenders will not be handcuffed to any part of the vehicle.

(2) Not engage in vehicle pursuits, high speed, or erratic driving.

OPNAVINST 5530.14D

JAN 3 0 2007

(3) Inspect the prisoner compartments of vehicles for contraband and weapons prior to and after each use, and search prisoners prior to placing them into a vehicle for transport.

d. When prisoners or suspects are to be transported by a person of the opposite sex, the driver will notify the dispatcher of the vehicle's mileage before starting the transport, and a record of the time and mileage will be recorded in the desk journal. Upon arrival at the destination, the dispatcher will again be notified of the ending mileage, and the time and mileage will be recorded in the desk journal. When possible, another patrol officer should ride in the transporting vehicle or follow in a vehicle directly behind.

1311. <u>Detention Cells</u>. The operation of detention cells is the responsibility of the Security Officer. When a detention cell is available, the following standards will apply:

a. Detention cells must be certified in accordance with reference (z), which specifies the requirements for processing of detainees and prisoners.

b. Standard operating procedures will be prepared.

c. Only designated personnel will be allowed into the detention cell area. Personnel working in the area will not be armed with any weapon, including firearms, riot control agents, batons, or other such devices unless in the performance of duties such as during prisoner disturbance.

1312. <u>Rules of Engagement and Rules for the Use of Force</u>

a. The Standing Rules of Engagement reference (as), establish fundamental policies and procedures governing the actions to be taken by U.S. commanders and their forces during all military operations and contingencies and routine Military Department functions occurring outside U.S. territory (which includes the 50 states, the Commonwealths of Puerto Rico and Northern Marianas, U.S. possessions protectorates and territories) and outside U.S. territorial seas. Routine Military Department functions include AT/FP duties, but exclude law enforcement and security duties on DOD installations, and off-installation while conducting official DOD security functions, outside U.S. territory and territorial seas. SROE also apply to air and maritime homeland defense missions conducted within U.S. territory or territorial seas, unless other wise directed by the Secretary of Defense.

OPNAVINST 5530.14D

JAN 3 0 2007

b.   The Standing Rules for the Use of Force (reference
(as)) establish fundamental policies and procedures governing
the actions to be taken by U.S. commanders and their forces
during all DOD civil support (e.g., military assistance to civil
authorities) and routine Military Department functions
(including AT/FP duties) occurring with U.S. territory or U.S.
territorial seas.  SRUF also apply to land homeland defense
missions occurring within U.S. territory and to DOD forces,
civilians and contractors performing law enforcement and
security duties at all DOD installations (and off-installation
while conducting official DOD security functions), within or
outside U.S. territory, unless otherwise directed by the
Secretary of Defense.  Host nation laws and international
agreements may limit U.S. forces means of accomplishing their
law enforcement or security duties.

c.   Commanders at every echelon are responsible for
establishing mission specific ROE for mission accomplishment
that comply with ROE of senior commanders and standing rules of
engagement (SROE). The SROE differentiate between the use of
force for self-defense and for mission accomplishment.
Commanders have the inherent authority and obligation to use all
necessary means available and to take all appropriate actions in
the self-defense of their unit and other U.S. forces in the
vicinity.  Reference (as) pertains.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE, D.C. LODGE 1, NDW LABOR COMMITTEE, INC. 711 4TH Street, N.W., Washington, D.C. 20001; FRATERNAL ORDER OF POLICE FIRST FEDERAL LODGE 1-F. 1336 Spring Garden Street, Philadelphia, PA 19123; JOSEPH BARBETTS, 203 Haegele Place, Mt. Royal, NJ 08061; ANTHONY ANZIDEO, 2616 South 12th Street, Philadelphia, PA 19148; JAMES W. WATERS, 3209 Radford Lane, Fort Washington, MD 20744, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 08cv39 (RJL) |
| ROBERT M. GATES, in his official capacity as Secretary of the Department of Defense, 1000 Defense Pentagon Washington, DC 20301-1000 | ) ) ) ) ) | |
| Defendant. | ) | |

**Declaration of Eric Hammett in Support of Defendant's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6)**

I, Eric Hammett, declare the following to be true and correct.

1.    I am a Civilian Employee employed by the Department of the Navy. Specifically, I am the Supervisory Security Specialist (Regional Training Director) for the Naval District of Washington (NDW) Security Department. In this position, I monitor the scheduling and training for all law enforcement officers employed by the Naval District of Washington.

2.    I have held my current position since August 16, 2002. Prior to this position, I was employed by the Naval District of Washington. My job title was Police Officer/Instructor. I was in that position from November 22, 1998 until August 16, 2002.

Gov. Exh. 4

3.      One of the duties of my current position, in addition to scheduling training, is to maintain the training records for the civilian law enforcement personnel assigned to the Naval District of Washington.

4.      I know from personal knowledge  that the NDW law enforcement officers have received Level I OC spray training since at least 2000.  Under this training, trainees receive a short burst of OC spray to their face.

5.      A review of the training records reveals that approximately 95 percent of the law enforcement officers have received the Level I OC spray training.

6.      I am also aware through my position that the law enforcement officers are covered by a collective bargaining agreement between the Department of the Navy and the Fraternal Order of Police, Lodge 1.  All of the law enforcement officers, except supervisory members, who have received training are also members of the Fraternal Order of Police.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of April, 2008

_L. E. Hammett_
ERIC HAMMETT

Gov. Exh. 4



# Fraternal Order of Police
### District of Columbia Lodge #1
### Washington, D.C.

# History of the Lodge

Links

Home
President's Message
Board of Directors
Lodge Committees
Labor Committees
Member Agencies
Constitution & Bylaws
History of the Lodge
Restaurant & Club
Banquet Facility & Catering
National Police Week
Become a Member
Suggested Links
FOP Grand Lodge
FOP Simulcast
Contact Us
Upcoming Events

In the Spring of 1915, most police officers in the United States were underpaid and overworked. Officers were prohibited from participating in labor organizations or strikes.

During those days, two police officers from Pittsburgh, Pennsylvania met and decided there was a need for an organization to improve working conditions and represent the "THIN BLUE LINE", between crime and society. From that simple beginning, the Fraternal Order of Police was born and has grown to an organization with 275,000 members. The FOP is the largest law enforcement organization in the United States. Along with civilian associate members from all walks of life; the FOP of today continues to represent the interest of working police officers.

The Fraternal Order of Police Lodge DC #1 was chartered in 1966. The Lodge was later named after the first member killed in the line of duty, Officer Jerrard F. Young.

In November of 1977, the FOP Auxiliary to DC Lodge 1 was formed, to promote fellowship between police families. Their objective is to increase understanding between individual officers and their families. The Lodge offers a place to voice ideas and concerns. The Lodge promotes fraternalism and the opportunity to interact with fellow police officers.

The Lodge is composed of members from 114 different law enforcement agencies and civilian associate members from all walks of life. The Lodge is involved in many community projects, charities and social functions as well as their efforts to improve law enforcement.

*last updated 02/2/07*



GOVERNMENT EXHIBIT
5

# First Federal Lodge of the United States

Fraternal Order of Police

## History

The lodge was chartered in Philadelphia, Pennsylvania on May 20, 1966 by a group of Federal Police Officers at the Philadelphia Naval Base and Shipyard. The Lodge, originally known as **Pennsylvania Lodge 81**, was the only one chartered for Federal Police Officers in the country. The Lodge grew in membership and then entered into becoming a recognized bargaining unit for the Naval Base and Shipyard police officers.

Police Officers at the US Army's Frankford Arsenal joined Lodge 81, expanding the membership greatly. It was at this time that the Lodge changed its name to **1F-PA**, becoming the **First Federal Lodge of Pennsylvania**. The Police Officers at the Arsenal became the next recognized bargaining unit under the Lodge. Also joining the Lodge were Police Officers from the Defense Personnel Supply Center in Philadelphia, becoming the next recognized bargaining unit in the Lodge. During this time of growth, other agency Police Officers joined the Lodge as individual members, bringing a wide variety of experiences to the FOP.

The Lodge also represented Police Officers with the Department of Defense (DoD) Police at the Trenton Naval Air Station in New Jersey, and the Willow Grove Naval Air Station and the Warminster Naval Air Development Center in Pennsylvania. The next groups to join the Lodge as bargaining units were US Mint Police and Rangers from the National Park Service.

Current members are from a large cross-section of various federal law enforcement agencies, from GS-083 Police Officers to GS-1811 Investigators. Current agencies include DoD Police, National Park Service, US Mint Police, Defense Criminal Investigators, Veterans' Affairs Police, Federal Bureau of Prisons, Federal Protective Service, Fish and Wildlife Service, and US Marshals, just to name a few.

The Lodge has a core group of retired officers who have a wealth of knowledge and experience to share with the current members. We also have a number of Associate Members who support the Lodge in many ways.

The Lodge once again changed its name to reflect the diverse membership. It is now known as **The First Federal Lodge of the United States, 01F/USA, Fraternal Order of Police**.

The First Federal Lodge has a direct charter to the Grand Lodge and is comprised solely of Federal Law Enforcement Officers. The First Federal Lodge represents a large cross-section of federal officers from different agencies and continues to grow to become a force and voice for our members. First Federal is also a supporter of the Grand Lodge's Federal Officers Committee and the Federal Coalition.

- **Pages**
  - Contact Us
  - Forms
  - History
  - Merchandise

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRATERNAL ORDER OF POLICE, D.C.    )
LODGE 1, NDW LABOR COMMITTEE,    )
INC. 711 4TH Street, N.W., Washington,    )
D.C. 20001; FRATERNAL ORDER OF    )
POLICE FIRST FEDERAL LODGE 1-F.    )
1336 Spring Garden Street, Philadelphia, PA    )
19123; JOSEPH BARBETTS, 203 Haegele    )
Place, Mt. Royal, NJ 08061; ANTHONY    )
ANZIDEO, 2616 South 12th Street,    )
Philadelphia, PA 19148; JAMES W.    )
WATERS, 3209 Radford Lane, Fort    )
Washington, MD 20744,    )
   )
       Plaintiffs,    )
   )
       v.    )      Civil Case No. 08cv39 (RJL)
   )
ROBERT M. GATES, in his official    )
capacity as Secretary of the Department    )
of Defense, 1000 Defense Pentagon    )
Washington, DC 20301-1000    )
   )
       Defendant.    )

### Declaration of Lieutenant Colonel Stephen Simpson
### in Support of Defendant's Motion to Dismiss Pursuant to
### Federal Rule of Civil Procedure 12(b)(6)

      I, Lieutenant Colonel Stephen Simpson, declare the following to be true and correct.

1.      I am a lieutenant colonel in the United States Marine Corps. I was received my commission in 1989. I am currently assigned to the office of the Commandant of the Marine Corps, Headquarter Marine Corps, PP&O PS Division. I have been in this position since 2007.

2.      From 1996 – 1998, I was a captain in the United States Marine Corps, stationed at Ft McClellan, Alabama. My official job title during that time was Operations Officer, Basic Military Police Training Division, U.S. Army Military Police School.



GOVERNMENT
EXHIBIT
6

1

3.    In 1996, the Department of Defense issued Directive 3000.3 (DODD 3000.3). This Directive established DOD policy for the use of non-lethal weapons (NLW). It provided that the Commandant of the Marine Corps would be the Executive Agent for DOD NLW program.

4.    The idea of developing a policy for the use of NLW grew out of the Marine Corps' successful withdrawal of 2,500 United Nations peacekeepers from Somalia in 1995. At that time, it became apparent that NLW could be effectively used to accomplish a mission, especially when there are issues of crowd control and non-traditional combatants (e.g., civilian crowds).

5.    Pursuant to DODD 3000.3, the Joint Non-Lethal Weapons Directorate (JNLWD) was created to support the Commandant of the Marine Corps in his role as the Executive Agent.

6.    As a direct result of DODD 3000.3, I was assigned to work on the development of a training course for the use of NLW, to include oleoresin capsicum (OC) spray. It is important to understand that OC spray is just one component of NLW. This training was sponsored by the JNLWD.

7.    NLWs are designed to incapacitate personnel or materiel, while minimizing fatalities, permanent injury to personnel, and causing undesired damage to property and the environment. They contrast with lethal weapons, such as firearms, in that lethal weapons are designed to cause death or destroy their target. NLWs are intended to have either reversible effects on personnel or materiel or to affect objects differently within their area of influence, or both.

8.    During the 1996-1998 time frame, I worked with counterparts from the United States Army, and was responsible for the development of the Inter-service Non-lethal Individual Weapons Instructor Course (INIWIC). Normally, training is done individually by the various services (Army, Navy, Air Force). However, the working group determined that there should be standardized instruction and the elimination of duplicate training courses.

9.    The goal in developing this course was to develop a "train the trainer" course. INIWIC was originally taught in 12 subcourses. The original purpose, scope and training requirements are outlined in appendix C of MCRP 3-15.8 titled Multiservice Procedures for the Tactical Employment of Nonlethal Weapons.

10.    Because there was no "military" course in existence, we examined existing training courses. The vast majority of these had been developed by local law enforcement departments or commercial industry.

11.    In particular, we spent several weeks observing and taking part in the training conducted by the Los Angeles Sheriff's Department. This training consisted of being exposed to OC then disassembling and assembling a service pistol with the intent of

demonstrating the ability to work through self exposure. At time, we were convinced that self contamination was a high probability.

12.   In addition to observing and participating in training, we spent many hours discussing training, and the concept of force continuum with experts in the field. Most notably Sid Heal, Los Angeles Sheriff's Department and Major Steve Ijames, Springfield Police Department MO.

13.   The training requirements that were developed covers the entire spectrum of force continuum model and the use of escalation of force. This training includes instruction in crowd dynamics and crowd control; communication skills; oleoresin capsicum aerosol training and other riot control agent training; open hand control; impact weapons (e.g., batons); introduction to military working dogs; law of war/rules of engagement training; non-lethal munitions and employment; barriers/physical security measures; and tactics.

14.   Non-lethal technology can reduce needless casualties, especially civilian casualties and is an effective tool that can be used. Training in NLW must be substantial and practical.

15.   It was determined that because of the high probability of exposure to oleoresin capsicum spray, any training should include actual exposure to that spray. Such training has been incorporated into the INIWIC training. The purpose behind this is to teach the student how to fight through the contamination and to protect him or herself, and also to be aware of the effects of oleoresin capsicum spray.

I certify under penalty of perjury that the foregoing is true and correct. Executed this 16th day of April, 2008.


Stephen A. Simpson
LtCol, U.S. Marines

3

ARMY, MARINE CORPS, NAVY



# NLW

## MULTISERVICE PROCEDURES FOR THE TACTICAL EMPLOYMENT OF NONLETHAL WEAPONS

FM 90-40
MCRP 3-15.8
NWP 3-07.31
USCG PUB 3-07.31

## OCTOBER 1998

AIR LAND SEA
APPLICATION
CENTER

DISTRIBUTION RESTRICTION: Approved
for public release; distribution is unlimited.

**Appendix C**

# NONLETHAL INDIVIDUAL WEAPONS INSTRUCTOR COURSE

This appendix provides an overview of the Nonlethal Individual Weapons Instructor Course (NIWIC). NIWIC is a "train the trainer" course taught in 12 sub-courses. Section I provides NIWIC descriptive data that includes the purpose, scope, peacetime, and mobilization training requirements, student prerequisites, and equipment/ammunition requirements to successfully complete the course. Section II lists the total training days and hours required per academic subcourse. Section III gives a detailed description of each sub-course and terminal learning objectives that each student must meet to complete the course. Section IV is a listing of 12 annexes that comprise the NIWIC POI. Additionally, the entire NIWIC with history, updates, and lesson plans can be accessed at— http://www.ftmc-marine.army.mil/.

## SECTION I - NIWIC DESCRIPTIVE DATA

### COURSE DESCRIPTION

1.   Course Title:  Nonlethal Individual Weapons Instructor Course

2.   Location:  Military Police School, Ft McClellan, Alabama

3.   Marine Corps Service:  TBD
School Code:

4.   Other Service Course Number:  TBD

5.   Military Assistance:  N/A
Program Articles and Service List Number:

6.   Purpose:  To certify selected marines/soldiers as nonlethal individual weapons instructors.

7.   Scope:  This course is designed to train marines/soldiers in the tasks necessary to perform duties as nonlethal individual weapons instructors.  This course is primarily designed for 58XX/85XX NCOs, SNCOs, and officers.  Combat arms MOSs can be trained also.

| | |
|---|---|
| 8.   Length (Peacetime) | 14.5 training days |
| 9.   Curriculum Breakdown (Peacetime) | 116.5 total hours<br>44 hours lecture/demonstrations<br>65.5 hours practice application<br>5.0 hours written exams<br>2.0 hours administrative hours |

## COURSE DESCRIPTION (CONTINUED)

10.     Length (Mobilization):  Same as Peacetime

11.     Curriculum Breakdown (Mobilization):  Same as Peacetime

12.     Maximum Class Capacity:  20

13.     Optimum Class Capacity:  15

14.     Minimum Class Capacity:  5

15.     Class Frequency: 8

16.     Prerequisites:  Students must be selected by commanders or provost marshals as nonlethal individual weapons instructors.

17.     MOS Received:  5816 (secondary)

18.     Quota Control:  CMC/DA

19.     Funding:  CMC/DA/Local

20.     Reporting Instructions:  Marine students report with orders to the commanding officer, Marine Corps Detachment, Building 1602, Ft McClellan, Alabama, no later than 2400 on the day prior to class convening.  No quarters or messing are available for SNCOs or officers.

21.     Instructor Staffing:  Two additional 5811 SNCOs are required.  Requirements, current   staffing is not adequate to conduct this course.

22.     School Overhead:  Additional overhead will be necessary for live fire training, handouts, and training aids.

23.     Training Support:  All training and administrative  support will be provided by the Marine Corps Detachment, Ft McClellan, Alabama.

## REQUIRED EQUIPMENT

| Item | Quantity |
|------|----------|
| Riot Face Shield | 30 |
| 31 Inch Riot Baton w/Belt Ring | 30 |
| PR-24 Side Handle Baton | 30 |
| Striking Bags | 15 |
| 25 RNA 12-ga Shell Pouches | 30 |
| Portable Bull Horn | 2 |
| 12-Volt Hand-Held Spotlight | 2 |
| P250 Water Pump (Fueled Powered) | 2 |
| Red Man Suit | 1 |
| Full Length Riot Shield | 30 |
| Vehicle Mounted Sticky Foam Dispenser | 2 |
| Caltrops | 100 |
| Sandbags | 5000 |
| M203 Grenade Launcher | 12 |
| Mosburgh 1100 3-Inch Shotgun | 6 |
| Benelli Super 90 Shotgun | 6 |

## CLASS V REQUIREMENTS

| Type Student | # Per Per Class | #Demo Rds Per Class | Total Per Year | Total |
|---|---|---|---|---|
| 12-ga OO Buck | 5 | 5 | 130 | 1040 |
| 12-ga 7 1/5 Shot | 5 | 5 | 130 | 1040 |
| 12-ga Rubber Pellet | 10 | 5 | 250 | 2000 |
| 12-ga Beanbag | 10 | 5 | 250 | 2000 |
| 12-ga Flashbang | 5 | 5 | 130 | 1040 |
| 12-ga Fin Stabilized | 10 | 5 | 250 | 2000 |
| 40mm Stinger | 5 | 5 | 130 | 1040 |
| 40mm Multiple Wood Baton | 5 | 5 | 130 | 1040 |
| 40mm Foam Baton | 5 | 5 | 130 | 1040 |
| #15 Stinger Grenades | 12 | 4 | 304 | 2432 |
| 12-ga Stinger Launcher | 12 | 4 | 304 | 2432 |
| MK141 Diversion Devices | 5 | 2 | 130 | 1040 |
| 5.56mm (Ball) | 50 | 20 | 1270 | 10160 |

## SECTION II - TOTAL TRAINING DAYS

### 16.5 TRAINING DAYS

| Academic Subjects | Hours |
|---|---|
| Instructor Development | 8.2 |
| Force Continuum | 2.2 |
| Crowd Dynamics/Crowd Control | 8.4 |
| Communication Skills | 8.0 |
| Oleoresin Capsicum Aerosol Training | 8.0 |
| Open Hand Control | 24.0 |
| Impact Weapons | 36.0 |
| Introduction to Military Working Dogs | 1.0 |
| ROE/Law of War/Constitutional Seizure | 2.5 |
| Nonlethal Munitions and Employment/Live Fire | 12.2 |
| Barriers/Physical Security Measures | 4.0 |
| Tactics (Dismounted/Mounted) | 4.0 |
| **Subtotal** | **114.5** |
| **Administrative Subjects** | |
| Student Processing | 2.0 |
| **Grand Total** | **116.5** |

**SECTION III - BODY**

PEACETIME/MOBILIZATION - 16.5 TRAINING DAYS

**Subject**

**1. Instructor Development.** This subcourse reinforces the student's instructional capabilities.

**2. Force Continuum.** This subcourse introduces the student to the federal force continuum model as outlined by MCO 5500.6F, *Arming of Law Enforcement and Security Personnel and the Use of Deadly Force.* Upon completion, the student will be able to instruct others on the six levels of resistance, proper levels of force, and factors influencing the decision to use force. Additionally, students will also instruct how nonlethal technologies affect the force continuum, preconditions of deadly force, six authorized occasions for the use of deadly force continuum, and the proper application of force.

**3. Crowd Dynamics/Crowd Control.** This subcourse outlines the differences between crowds, mobs, and riots and teaches the student basic crowd control techniques that will easily be applied to various situations. Upon completion, the student will be able to instruct others in on the behavioral aspects of a crowd during a civil disturbance, various aspects of controlling a civil disturbance, and how to form and conduct a riot patrol formations. The student will be familiarized with classical tactics and techniques and will also consider nontraditional and small unit application.

**4. Communication Skills.** This subcourse will teach the student how to instruct others on interpersonal communication skills and techniques to defuse situations.

**5. Oleoresin Capsicum Aerosol Training.** This subcourse will teach the student how to safely and thoroughly instruct others to use pepper spray, supervise proper employment for training and discuss actual situations. The student will learn decontamination requirements, legal/policy considerations, and tactical considerations imposed by detainees/casualties.

**6. Open-Hand Control.** This subcourse will teach the student to employ pressure point control techniques, unarmed self-defense measures, weapon retention techniques, and other submission/restraint/search techniques. Upon completion, the student will be certified to instruct proper open-hand control techniques and control of compliant and noncompliant individuals.

**7. Impact Weapons.** This subcourse will teach the student in the uses of various impact style weapons (batons) to include the rigid straight baton, collapsible straight batons, side handle batons, and riot control batons. Upon completion, students will be certified to instruct control of compliant and noncompliant individuals, proper straight baton and side handle baton techniques, and riot baton and shield tactics.

**8. Introduction to Military Working Dogs.** This subcourse will teach the student how to instruct on the role of military working dogs and the potential support available to forces requiring nonlethal force options. Upon completion, students will be able to instruct others on military working dogs capabilities, missions, and limitations.

**9. Rules of Engagement, Law of War, Constitutional Seizure.** This subcourse will teach the student how to instruct standing ROE surrounding domestic use of force to effect a seizure. Upon completion, students will be able to instruct others on the basic guidelines for establishing unit rules of engagement cards that include the use of nonlethal technologies.

**10. Nonlethal Munitions and Employment/Live Fire.** This subcourse will teach the student how to instruct the nonlethal munitions available. Students will participate in live fire exercises and upon completion of the course will be able to instruct others on the capabilities and limitations of various nonlethal rounds. Additionally, students will be able to conduct live fire ranges and certification of nonlethal munitions.

**11. Barriers/Physical Security Measures.** This subcourse will teach the student how to instruct others on barriers and physical security measures available to tactical forces. These measures complement the use of nonlethal force or mitigate the need for deadly force. Upon completion, the student will be able to instruct others on the proper employment of barriers/physical security expedients.

**12. Tactics (Mounted/Dismounted).** This subcourse will teach the student how to instruct others on mounted/dismounted tactics as they are related to the use of NLW. Upon completion, the student will be able to instruct others on proper tactical employment (mounted and dismounted) and nonlethal methods to quell civil disturbance. The instructor will use training tactics and actual operations scenarios. Military operation on urbanized terrain (MOUT) requires different tactics, techniques, and procedures because of the heavily built-up environment.

## SECTION IV - ANNEXES

### LISTING OF THE ANNEXES FOR EACH SUBCOURSE WITHIN THIS POI

| **Annexes** | **Title** | **Page No.** |
|---|---|---|
| A | Instructor Development | |
| B | Force Continuum | |
| C | Crowd Dynamics/Crowd Control | |
| D | Communication Skills | |
| E | Oleoresin Capsicum Aerosol Training | |
| F | Open-Hand Control | |
| G | Impact Weapons | |
| H | Introduction to Military Working Dogs | |
| I | Rules of Engagement, Law of War, Constitutional Seizure | |
| J | Nonlethal Munitions and Employment/Live Fire | |
| K | Barriers/Physical Security Measures | |
| L | Tactics (Mounted/Dismounted) | |