UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**FRATERNAL ORDER OF POLICE, D.C.**
**LODGE 1, NDW LABOR COMMITTEE,**
**INC.**, et. al.,

          Plaintiffs,

               v.                            08-cv-0039(RJL)

**ROBERT M. GATES**,

          Defendant.

_____/

## **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

      Plaintiffs, through counsel, file this opposition to Defendant's Motion to Dismiss.  As further grounds, counsel would state:

**I.**      **Background**

      Plaintiffs brought this action challenging the defendant's direct contamination concerning the use of oleocapsicum spray (OC) spray during its Level I training.  In this regard, plaintiffs challenge the defendants program which requires that the plaintiffs receive a direct impact spray in the plaintiffs' face which subjects them to pain, suffering and the potential for death should the plaintiffs have an adverse action to the spray.

      Similarly, the plaintiffs challenge the defendant's right to subject them to this unwarranted, unnecessary and unreasonable risk of injury or death.  There are certainly other less extreme and less dangerous methods of exposing the plaintiffs' to OC Spray without subjecting them to the dangers and physical suffering direct impact exposure causes; which meets the government's need to train its civilian police officers; and which protects the plaintiffs' constitutional rights not to be subjected to governmental action which exposes them to an

unreasonable risk of serious injury.

## II.     Factual Allegations [1]

On January 30, 2007, the Navy implemented OPNAVINST 5530.14D which approved non-lethal weapons training for *civilian police officers* employed by the Navy. (Comp. ¶25) One aspect of the non-lethal training includes training *civilian police officers* in the use of oleoresin capsicum (OC) spray. (Comp. ¶26) The Navy training program has three levels. **Level I** training includes the direct facial spraying and contamination of the plaintiffs with OC spray.[2] **Level II** training involves a non-impact exposure to OC Spray wherein the contaminate is smeared on the skin beneath the eyes of the plaintiffs. **Level III** training also involves a non-impact exposure of OC Spray requiring the plaintiffs to walk through a room where the spray has been released. (Comp. ¶27)

Oleoresin capsicum is an oily extract of pepper plants and is used as the active ingredient in OC spray. It is not water soluble. OC spray is registered as pesticide with the U.S. Environmental Protection Agency. (Comp. ¶28) In the same vein, OC spray extract contains a complex mixture of phenols known as capsaicinoids. Capsaicinoid content determines the "hotness" of the extract. (Comp. ¶29) The relative hotness of the extract is measured in Scoville Heat Units (SHU) which is the greatest dilution of pepper extract that can be detected by the human tongue. (Comp. ¶30)

---

[1] "[I]n considering the claims dismissed pursuant to Rule 12(b)(6), we must treat the complaint's factual allegations as true [and] must grant plaintiff the benefit of all reasonable inferences from the facts alleged," *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).

[2]      Level I direct contamination and the unreasonable risk of injury to the plaintiffs is what is at issue in this matter.

OC Spray is a dangerous substance.  Once contaminated with a ***Level I direct blast*** of OC spray, the plaintiffs will experience the following physiological responses:

      a.      Their skin will experience tingling, intense burning pain, swelling, redness and potential blistering;

      b.      The capsaicin in the spray will augment any allergic sensitization and worsen allergic dermatitis;

      c.      Plaintiffs will suffer respiratory responses to the OC spray contamination including burning of the throat, wheezing, dry cough, shortness of breath, gagging, gasping, inability to breath or speak due to laryngospasm or laryngeal paralysis;

      d.      In some instances, the plaintiffs might experience cyanosis and respiratory arrest.[3]

      e.      Nasal inhalation of OC spray by the plaintiffs will cause sneezing, irritation, and mucus secretion.  Its inhalation can cause acute hypertension which in turn can cause headache and increase the risk of stroke or heart attack.

      f.      Plaintiffs' eyes will experience redness, swelling, severe burning pain, stinging, conjunctival inflammation, shedding of tears and involuntary and reflex closing of the eyelids. Any plaintiff experiencing problems with corneal erosion would be more susceptible to severe ocular effects than individuals with normal corneas.  (Comp. ¶31)  OC spray has resulted in the death of individuals who have been directly sprayed and contaminated with the spray.  (Comp. ¶32)  By letter dated November 28, 2007, the defendant indicated that it would enforce the Navy policy of the OC spray in the face contamination for civilian police officers employed by the

---

      [3]      Cyanosis is a physical sign causing bluish discoloration of the skin and mucous membranes. Cyanosis is caused by a lack of oxygen in the blood.

Navy.  (Comp. ¶33)

The purported authority for the use of OC Spray by the defendant is DoD Directive 3000.3.  By its expressed terms DoD Directive 3000.3 applies solely to the uniformed military forces of the United States and not the civilian workforce employed by the Department of the Navy.  (Comp. ¶23)

In response to the issuance of DoD Directive 3000.3, the United States Navy implemented a navy-wide training program for the use of non-lethal weapons for naval armed forces afloat and ashore.  Again, the program did not encompass the civilian workforce employed by the United States Navy.  (Comp. ¶24)

## III.    **Overview - Standard of Review**

Rule 12(b)(1) presents a threshold challenge to the court's jurisdiction, whereas 12(b)(6) presents a ruling on the merits with res judicata effect. *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003). The two sub-parts of the rule are governed by distinct legal standards.

### A.    **Motion to Dismiss for Lack of Subject-Matter Jurisdiction under Rule 12(b)(1)**

Broadly speaking, there are two types of Rule 12(b)(1) motions. "A facial challenge attacks 'the factual allegations of the complaint' that are contained on 'the face of the complaint,' while a factual challenge is addressed to the underlying facts contained in the complaint. *Loughlin v. United States*, 230 F. Supp. 2d 26, 35-36 (D.D.C. 2002).  Where the government makes a facial challenge, "the [C]court must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party," *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006),  just as it would on a

motion to dismiss under Rule 12(b)(6). *see Price v. Socialist People's Libyan Arab Jamhiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002) (noting that standard for facial challenge to subject-matter jurisdiction "is similar to that of Rule 12(b)(6)").

Where a factual challenge is made, the Court "may consider materials outside the pleadings "to determine whether it has subject-matter jurisdiction over the challenged case or claims, *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) and "the plaintiff bears the burden of establishing the factual predicates of jurisdiction by a preponderance of the evidence," Erby, 424 F. Supp. 2d at 182. For this latter type of challenge, plaintiffs must "be given an opportunity for discovery of facts necessary to establish jurisdiction." *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001).[4]

**B.    Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)**

To avoid dismissal on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff's complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. *Erickson v. Pardus*, 511 U.S. 825 (2007). A Rule 12(b)(6) motion is intended to test the legal sufficiency of the complaint. *Kingman Park Civic Association v, Williams*, 348 F.3d 1033 (D.C.Cir. 2003). Accordingly, the complaint must set forth both notice to the defendant and sufficient facts that the complaint as a whole makes a showing of entitlement to relief. *Bell Atlantic v. Twombly*, ___ U.S. ___. 127 S. Ct. 1955 (2007). Thus, the complaint must show that the claim is plausible rather than merely speculative. *Id.* at 1964.

As noted previously, the court must accept the FOP's factual allegations as true, *see*

---

[4]    For purposes of this motion, plaintiffs assumed that the defendant is making a facial challenge to the court's jurisdiction.

*Albright v. Oliver*, 510 U.S. 266, 268 (1994), and draw all inferences in the plaintiff's favor. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). In the instant case, plaintiff alleged sufficient facts to show that its claim plausible and should survive a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6).

## IV.    The CSRA Does Not Preclude the Plaintiffs' Constitutional or APA Claim

Initially, it must be noted that the defendant attempts to couch this complaint as one challenging the potential removal of the plaintiffs from their employment. That is incorrect. No where in the complaint or prayer for relief do the plaintiffs alleged, must less seek relief, from a potential adverse action based on their refusal to subject themselves to OC spray poisoning. Plaintiffs assert a colorable constitutional claims under the Fifth Amendment of the U.S. Constitution and a statutory challenge to agency action under the APA. Neither claims are precluded by the Civil Service Reform Act (CSRA). Finally, the challenged action of the government is not a "personnel action" within the ambit of the CSRA and consequently not preempted by the Act.

The Civil Service Reform Act (CSRA), enacted in 1978, created an elaborate framework for evaluating adverse personnel actions against federal employees. *United States v. Fausto*, 484 U.S. 439, 443, 452 (1988). The Act prescribe in great detail the protections and remedies applicable to such actions, including the availability of administrative and judicial review. *Id.* at 443. In this regard, the Act establishes three levels of personnel actions and provides different remedies for each level.

First, for major personnel actions specified in the statute (adverse actions), direct judicial review occurs after extensive prior administrative proceedings. Second, for specified minor

personnel actions infected by an improper motive or disregard of the law (prohibited personnel practices), review is with the Office of the Special Counsel (OSC) with limited judicial review. Finally, for minor personnel actions, there is no review by OSC or the courts.

The Administrative Procedures Act, on the other hand, provides generally for judicial review of final agency action for which there is no adequate remedy in court.  *See* 5 U.S.C. §702. The Act is inapplicable, however, to the extent that other statutes preclude review.

The CSRA does not preclude review of this action as either a constitutional challenge or an action under the CSRA because the challenged agency action is neither a "personnel action," nor "adverse action," or prohibited personnel practice within the ambit of the CSRA.

**5 U.S.C §2302(a)(2)(A)** defines personnel action as:

(i)      an appointment;

(ii)     a promotion;

(iii)    an action under chapter 75 of this title or other disciplinary or corrective action;

(iv)     a detail, transfer, or reassignment;

(v)      a reinstatement;

(vi)     a restoration;

(vii)    a reemployment;

(viii)   a performance evaluation under chapter 43 of this title;

(ix)     a decision concerning pay, benefits, or awards, concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph;

(x)      a decision to order psychiatric testing or examination; and

(xi)     any other significant change in duties, responsibilities, or working conditions;

7

**5 U.S.C. §7512** describes an adverse action as;

(1)     a removal;

(2)     suspension for more than 14 days, including indefinite suspension;

(3)     reductions in grade;

(4)     reductions in pay; and

(5)     furloughs of thirty days or less.

**5 U.S.C. §2302** describes a prohibited personnel practice:

(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority -

(1) discriminate for or against any employee or applicant for employment -

(A) on the basis of race, color, religion, sex, or national origin, as prohibited under section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16);

(B) on the basis of age, as prohibited under sections 12 and 15 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 631, 633a);

(C) on the basis of sex, as prohibited under section 6(d) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(d)); (D) on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791); or

(E) on the basis of marital status or political affiliation, as prohibited under any law, rule, or regulation;

(2)     solicit or consider any recommendation or statement, oral or written, with respect to any individual who requests or is under consideration for any personnel action unless such recommendation or statement is based on the personal knowledge or records of the person furnishing it and consists of -

8

(A)    an evaluation of the work performance, ability, aptitude, or general qualifications of such individual; or

(B) an evaluation of the character, loyalty, or suitability of such individual;

(3)    coerce the political activity of any person (including the providing of any political contribution or service), or take any action against any employee or applicant for employment as a reprisal for the refusal of any person to engage in such political activity;

(4)    deceive or willfully obstruct any person with respect to such person's right to compete for employment;

(5)    influence any person to withdraw from competition for any position for the purpose of improving or injuring the prospects of any other person for employment;

(6)    grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment;

(7)    appoint, employ, promote, advance, or advocate for appointment, employment, promotion, or advancement, in or to a civilian position any individual who is a relative (as defined in section 3110(a)(3) of this title) of such employee if such position is in the agency in which such employee is serving as a public official (as defined in section 3110(a)(2) of this title) or over which such employee exercises jurisdiction or control as such an official;

(8) take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of -

(A)    any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences -

(i)    a violation of any law, rule, or regulation, or

(ii)    gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, if such disclosure is not specifically prohibited by law and if such information is not specifically required by Executive order to be kept secret in the interest of national defense or the conduct of foreign affairs; or

(B)      any disclosure to the Special Counsel, or to the Inspector General of an agency or another employee designated by the head of the agency to receive such disclosures, of information which the employee or applicant reasonably believes evidences -

(i)      a violation of any law, rule, or regulation, or

(ii)      gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety;

(9)      take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of -

(A)      the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation;

(B)      testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A);

(C)      cooperating with or disclosing information to the Inspector General of an agency, or the Special Counsel, in accordance with applicable provisions of law; or

(D)      for refusing to obey an order that would require the individual to violate a law;

(10)      discriminate for or against any employee or applicant for employment on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others; except that nothing in this paragraph shall prohibit an agency from taking into account in determining suitability or fitness any conviction of the employee or applicant for any crime under the laws of any State, of the District of Columbia, or of the United States;

(11)      (A) knowingly take, recommend, or approve any personnel action if the taking of such action would violate a veterans' preference requirement; or (B) knowingly fail to take, recommend, or approve any personnel action if the failure to take such action would violate a veterans' preference requirement; or

(12)      take or fail to take any other personnel action if the taking of or failure to take such action violates any law, rule, or regulation implementing, or directly concerning, the merit system principles contained in section 2301 of this title.

As the court will note, the plaintiffs' claim in this case is not an adverse action as

suggested by the government in its motion.  (*Def. Mtn to Dismiss at p.8-9*)  Nor have the

plaintiffs suggested that it is.  Secondly, the plaintiffs do not allege that the government's policy

will lead to removal from the federal service.  (*Def. Mtn to Dismiss at p. 9*)  What they do allege

is that the government's policy and regulations will subject them to an unreasonable risk of harm

and potentially death by the direct impact spraying of a poison in their faces.

**(A)     The Plaintiffs' Constitutional Claim for Equitable Relief is Viable**

Where Congress intends to preclude judicial review of constitutional claims its intent to

do so must be clear.  *Webster v. Doe*, 486 U.S. 592, 603 (1988).  In *Webster*, the Supreme Court

held that a party must demonstrate a "heightened showing" that Congress intended to eliminate

judicial review when a federal statute is construed to deny any judicial forum for a *colorable*

*constitutional claim*.  *Id.*  Because the sole remedy sought in this case is for equitable relief, the

government fails to meet its burden.

Initially, some discussion of what a colorable claim encompasses is warranted.  The

courts have been generally consistent in defining what elements a "colorable claim" consists of.

In this regard, a "colorable claim" is one which is not 'wholly insubstantial, immarterial, or

frivilous."  *See e.g. McBride Cotton & Cattle Corp. v. Veneman*, 290 F.3d 973 (9th Cir. 2002);

*Vencor Nursing Ctrs. L.P. v. Shalala*, 63 F.Supp.2d 1 (D.D.C. 1999).

As it applies to the claim in this case, a substantive due process violation occurs when

the defendant's conduct is "so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience."  *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).  Conduct

intended to injure in some way unjustifiable by any government interest is the sort of official

action most likely to rise to the conscience-shocking level.  *Id.* at 849.

The District of Columbia Circuit has stated that the courts are not precluded "altogether"

from granting injunctive relief to federal employees for constitutional violations.  *Spagnola v.*

*Mathis*, 859 F.2d 223,229 (D.C. Cir. 1988) (en bane) (per curiam). In *Spagnola*, the court held that the CSRA preempted claims seeking *damages* for constitutional violations in the federal employment context, but it also stated that it had repeatedly "***affirmed the right of civil servants to seek equitable relief against their supervisors, and the agency itself, in vindication of their constitutional rights.***" *Id*. at 230.  (emphasis added)

Two years earlier, the D.C. Circuit affirmed the right of an individual to seek equitable relief under the APA against a federal agency for equitable relief resulting from an alleged constitutional violation despite CSRA preemption of his other claims.

In *Hubbard v. EPA*, 809 F.2d 1(D.C. Cir. 1986), the Court of Appeals examined a federal job applicant's claims under the Privacy Act and a *Bivens* claim for damages against a federal supervisor and an equitable claim for injunctive relief against the EPA for violation of the applicant's first amendment rights.  The court found that both the Privacy Act claim and the *Bivens* damage claim preempted by the CSRA under the doctrine espoused by the Supreme Court in *Bush v. Lucas*, 462 U.S. 367 (1983).  As to the equitable claim against the EPA, the court wrote:

> Because 5 U.S.C. §702 (1982)[5] waives sovereign immunity from suits not seeking money damages, federal courts have jurisdiction to grant equitable relief to remedy agency violations of constitutional rights.  "[There is a] presumed availability of federal equitable relief against threatened invasions of constitutional interests."  (citations omitted)  In particular, this Circuit has recognized the right of a federal job applicant to seek

---

[5]    5 U.S.C. §702 reads:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity . . . shall not be dismissed . . . on the ground that it is against the United States.

injunctive from an agency's violations of his constitutional rights in general, (citation omitted) and his first amendment rights in particular. (citations omitted)

*Id.*

Similarly, the courts have reaffirmed the principle that §702 of the Administrative Procedures Act "waives the Government's immunity from actions seeking relief other than money damages. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-61 (1999); *see also Jasperson v. Federal Bureau of Prisons*, 460 F.Supp.2d 76 (D.D.C.2006); *United States V. Waksberg*, 881 F. Supp. 36 (D.D.C. 1995). Thus, it is well-established that APA § 702's waiver of sovereign immunity permits not only the plaintiff's APA causes of action, but the plaintiff's non-statutory and constitutional actions as well. *See* e.g. *Trudeau v. Federal Trade Commission*, 456 F.3d 178 (D.C.Cir 2006). In sum, this action is not preempted by the CSRA and the defendant's argument to the contrary should be rejected.

**B.    The Government's Policy and Directives Are Final Agency Action**

Whether there has been "agency action" or "final agency action" within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable. *See Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005); *DRG Funding Corp. v. Sec'y of Housing & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996). The APA defines an "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof." 5 U.S.C. § 551(13). This list is expansive. It is "meant to cover comprehensively every manner in which an agency may exercise its power." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 478 (2001).

In determining whether such action is final, the courts look to "whether the agency's

13

position is 'definitive' and whether it has a 'direct and immediate ... effect on the day-to-day business' of the parties." *Ciba-Geigy Corp. v. United States Envtl. Protection Agency*, 801 F.2d 430, 436 (D.C. Cir. 1986); *see also Bennett v. Spear*, 520 U.S. 154, 178 (1997) (An agency action is final if it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow.").

In the instant case, it strains credulity to suggest that neither Directive 3000.3 nor OPNAVINST 5530.14D do not fall within the ambit of final agency action. Indeed, by the governments own submissions, the directives and instructions: (i) establish DoD policies; (ii) define the circumstances when OC Spray is utilized; (iii) detail procedures for the use of OC Spray; (iv) provide guidance on the use of OC Spray; (vi) set standards for the use of OC Spray; and (viii) authorizes the use of OC Spray. Moreover, OPNAVINST 5530.14D is a Department of the Navy-wide regulation which specifically informs the reader that its purpose is to:

> To Issue policy, identify standards for security and law enforcement operations within the Navy

(Def. Exh. 3)

The instruction further informs the reader that the objective of the instruction is to establish policy. . .provide guidance and set forth standards. *Id.* at paragraph 4. The instruction and its application to plaintiffs and other defendants is one by which their rights or obligations have been determined, or from which legal consequences will flow. In this regard, the plaintiffs are subject to an unreasonable risk of injury or death.

Of equal importance is the fact that the government in none of its submissions to the

court, has denied the physiological effects or potential injuries which the plaintiffs allege they

will suffer.  Indeed the government concedes, that with a Level I direct contamination exposure,

the employee will suffer the claimed physiological reaction.  This is final agency action.

**C.    The Agency's Decision on Level I Contamination is not Committed to Agency Discretion**

The defendant argues next that its decision to spray the plaintiffs in the face with a poison

and pesticide which can cause permanent injury or death is "committed to agency discretion" is

beyond belief.

There is a strong presumption of reviewability under the Administrative Procedure Act,

*Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967); however, the APA expressly precludes

judicial review of agency action "committed to agency discretion by law." 5 U.S.C. §701(a)(2).

Agency action is committed to agency discretion by law when "the statute is drawn so that a

court would have no meaningful standard against which to judge the agency's exercise of

discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1984). If no "judicially manageable standard"

exists by which to judge the agency's action, meaningful judicial review is impossible and the

courts are without jurisdiction to review that action. *Id*.

The D.C. Circuit has noted that judicially manageable standards "may be found in formal

and informal policy statements and regulations as well as in statutes." *Padula v. Webster*, 822

F.2d 97, 100 (D.C. Cir. 1987). In determining whether agency statements create such a standard,

the court inquires as to whether the statements create binding norms by imposing rights or

obligations on the respective parties.  *Id*.

In the case at bar, there are judicial standards for reviewing the governments actions.

15

This court need only apply the time-tested principles relating to substantive due process. Government conduct that "shocks the conscience" violates the Fifth Amendment guarantee against deprivation of "life, liberty, or property, without due process of law." *See Rochin v. California*, 342 U.S. 165, 172-73 (1952); *Garcia v. Miera*, 817 F.2d 650, 653-56 (10th Cir. 1987) ("substantive due process" may protect against government action directly resulting in severe injury), *cert. denied*, 485 U.S. 959, 108 S. Ct. 1220, 99 L. Ed. 2d 421 (1988); *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980) ("substantive due process is concerned with violation of personal rights of privacy and bodily security of . . . [severe] magnitude . . . disproportionate to the need presented.").

The spraying in the face of a poisonous substance which indisputably causes the plaintiffs' skin to experience tingling, intense burning pain, swelling, redness and potential blistering; augments any allergic sensitization and worsen allergic dermatitis; includes burning of the throat, wheezing, dry cough, shortness of breath, gagging, gasping, inability to breath or speak due to laryngospasm or laryngeal paralysis; causes cyanosis and respiratory arrest; causes sneezing, irritation, and mucus secretion; and causes acute hypertension which in turn can cause headache and increase the risk of stroke or heart attack is the type of injury.   Given the reaction plaintiffs will suffer from exposure to Level I OC contamination, the court should reject the defendant's argument to the contrary. *See also. Heckler v. Chaney*, 479 U.S. 821 (1985)(when an agency consciously and expressly adopts a policy that is so extreme as to amount to an abdication of its statutory responsibilities, that policy is reviewable under the APA).

Defendant's reliance on *Dist. No. I, Pacific Coast Dist. Marine Eng. Beneficial Ass'n v. Maritime Admin.*, 215 F.3d 37 (D.C. Cir. 2000), is misplaced.  That case involved the Maritime

16

Administration's decisions regarding registry of vessels which the court found did not "admit of judicially manageable standards."

In the instant case, the plaintiffs are challenging the defendant's ability to spray a poison into the faces of the plaintiffs. The contamination and resulting injury plaintiffs will suffer as a result of a program does not adequately protect their personal security and is disproportionate to the need asserted by the defendant. Government conduct involving a substantial and unreasonable risk of injury or death is precisely the type of government conduct for which there can be judicially manageable standards.

**D.      The DoD Policy of Spraying a Toxin in the Faces of the Plaintiffs Which Will Result in an Unreasonable Risk of Injury or Death Is Arbitrary and Capricious**

The government tries to divert the focus of this case to the various directives. It claims that its policies are not arbitrary or capricious because the statutory provisions provide the Department of Defense with the authority to issue such directives. Thus, they argue, the policy is unreviewable. Plaintiff would point out to the court, it is not the authority of the Secretary of Defense to issue a policy that is at issue in this case. It is the authority of the defendant to adopt a policy of spraying a known toxin in the faces of the plaintiffs that is at issue.

The plaintiffs are constrained to point out that the suggestion by the government that spraying a known poison into the faces of the plaintiffs, which can unreasonably cause permanent injury or death, is somehow essential to law enforcement duties, is patently absurd.

Secondly, the failure of the government to consider some other less dangerous method of exposing the plaintiffs to a toxin rather than direct contact with the face is arbitrary and capricious and subject to this court's review.

In addressing claims of unreviewability, the D.C. Circuit has opined:

The burden on the appellees in advancing an argument against judicial review is a heavy one, and we conclude that they have completely failed to satisfy that burden. "The legislative material elucidating that seminal act [the APA] manifests a congressional intention that it cover a broad spectrum of administrative actions, and this Court has echoed that theme by noting that the Administrative Procedure Act's 'generous review provisions' must be given a 'hospitable' interpretation." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140-41, 18 L. Ed. 2d 681, 87 S. Ct. 1507 (1967) (quoting *Shaughnessy v. Pedreiro*, 349 U.S. 48, 51, 99 L. Ed. 868, 75 S. Ct. 591 (1955)) (footnote omitted). We have indicated that under the APA there is "a strong presumption of reviewability that can be rebutted only by a clear showing that judicial review would be inappropriate." *NRDC, Inc. v. SEC*, 196 U.S. App. D.C. 124, 606 F.2d 1031, 1043 (D.C. Cir. 1979). *Accord Dunlop v. Bachowski*, 421 U.S. 560, 567, 44 L. Ed. 2d 377, 95 S. Ct. 1851 (1975) (absent express statutory prohibition of review, the Secretary bears a "heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of his decision"); *Abbott Laboratories*, 387 U.S. at 140 ("judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress"); *Rusk v. Cort*, 369 U.S. 367, 379-80, 7 L. Ed. 2d 809, 82 S. Ct. 787 (1962) (requiring "clear or convincing" evidence of congressional intent to make "broadly remedial provisions" of the APA unavailable to review acts under the Immigration and Nationality Act).

*See Int'l Ladies' Garment Workers Union v. Donovan*, 722 F.2d 795 (D.C. Cir. 1983) (ILGWU).

As the Supreme Court has explained: "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Thus, agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise." *Id.*

In the instant case, the government is attempting to apply a military standard to civilian law

enforcement. A standard, incidentally, which was developed for combat troops in the field.

There is no legitimate reason to support the use of a standard developed for combat troops in a

war zone as it applies to civilian law enforcement. The agency's decision in this matter is not the

product of reasoned thought or based upon a consideration of relevant factors as it applies to the

injury or death of an employee. *Specialty Equip. Market Ass'n v. Ruckelshaus*, 720 F.2d 124,

132 (D.C. Cir. 1983) (when reviewing agency's determinations under "arbitrary and capricious"

standard, "we must make a substantial and searching inquiry to ensure that the agency's decisions

are the product of reasoned thought and based upon a consideration of relevant factors"); *see also*

*ILGWU, supra* (in light of *Motor Vehicle Manufacturers Association*, we are constrained to hold

that the Secretary's failure to consider such alternatives, and to explain why such alternatives

were not chosen, was arbitrary and capricious, in violation of section 10(e) of the APA, 5 U.S.C.

§ 706(2)(1982).) The government's action is clearly not the product of reasoned thought. It

ignores the relevant facts and operative dangers. As a result, it is reviewable under the APA.

**E.     The Record is Devoid of Any Evidence to Suggest that the Government's OC Spray
        Policy Flows from a Statutory Scheme Designed by Congress**

The government's broad allegation is not supported by the record at this point. The

authority to issue regulations concerning the use of firearms and other appropriate weapons is a

far cry from Congressional authority to spray civilian law enforcement employees in the face

with a toxin which can cause serious injury or death. Yet, that is exactly what the government

suggests. Suffice it to say, agencies may act only pursuant to delegations of power that are

19

explicit or can fairly be implied from the statutory scheme. *See Railway Labor Executives Ass'n v. National Mediation Bd.*, 29 F.3d 655, 670-71 (D.C. Cir. 1994) (en banc). Neither the statutes, directives, instructions or affidavits cited by the government reveal an express directive for the Department of Defense or the Navy authorizing it to utilize the dangerous methods that are the subject of this litigation. And there is no basis for inferring such authority from any provision in the statute. The statute's only grants general authority to the DoD and Navy to promulgate implementing regulations. The defendant's argument to the contrary should be rejected.

**G.      The Plaintiffs' Substantive and Procedural Due Process Claims Are Cognizable**

The plaintiffs pleaded a claim for violation of their substantive due process rights. To assert a substantive due process the plaintiffs must allege that the defendant's conduct  is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento, supra;  Butera v. Dist. of Columbia*, 235 F.3d 637 (D.C. Cir. 2001). This stringent requirement exists to differentiate substantive due process, which is intended only to protect against arbitrary government action, from local tort law. *Sacramento,* 523 U.S. at 845-46. It is behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim, that is, conduct *intended to injure in some way* unjustifiable by any government interest which is most likely to rise to the conscience-shocking level. *Id.* at 849. Thus, the due process guarantees of the Constitution were intended to prevent government officials from abusing [their] power, or employing it as an instrument of oppression. See *Collins v. Harker Heights,* 503 U.S. 115, 126 (1992) (quoting *DeShaney v. Winnebago County Dept. of Soc. Servs.,* 489 U.S. 189, 196 (1989) and *Davidson v. Cannon,* 474 U.S. 344, 348 (1986)).

The Fifth Amendment thus requires that if the government acts to deprive any person of a

"property" or "liberty" right, it must act with due process in doing so. Since law enforcement employers are, by definition, governmental agencies subject to the strictures of the Fifth Amendment, whenever they make employment decisions affecting property or liberty interests, they must do so in accord with the requirements of the Fifth Amendment. *Brd. of Regents v. Roth*, 408 U.S. 564 (1972).

In the instant case, the government seeks to spray the plaintiffs in the face with a toxic pesticide for the purpose of educating plaintiffs about the effects of OC spray.  Following that line of logic, the government could order the plaintiffs to don a bulletproof vest as part of training and shoot them so they could experience the physiological effects of a gun shot.  They attempt to temper the true effects of OC spray by asserting Level I contamination will cause pain, redness and other physical discomfort.  What they don't tell the court is that the "other physical discomfort" can consist of    intense burning pain, swelling, redness and potential blistering; augments any allergic sensitization and worsen allergic dermatitis; burning of the throat, wheezing, dry cough, shortness of breath, gagging, gasping, inability to breath or speak due to laryngospasm or laryngeal paralysis; cyanosis and respiratory arrest; sneezing, irritation, and mucus secretion; and  acute hypertension which in turn can cause headache and increase the risk of stroke or heart attack is the type of injury.  Without a doubt, this is government action which implicates the plaintiffs' substantive and procedural rights under the 5th Amendment.  In the instant case, the plaintiff alleged sufficient facts to warrant review by the Court and sufficient facts to demonstrate entitlement to relief under the APA.

**H.    Plaintiffs' Associational Claims Are Valid and this Action is Not Time-Barred**

It is well established that an organization "may have standing in its own right to seek

judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). The question is simply whether the organization satisfies the usual requirements for standing. As a constitutional matter, a plaintiff must make the following showings: (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).

The Supreme Court has explained that each of these elements "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we `presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Id*. (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

The allegations set out in the complaint are sufficient to satisfy each of the required showings. (Comp. ¶¶14-21) First, with respect to injury in fact, the complaint fairly alleges that the defendant's actions will interfere with the FOP's members not to be subjected to an unreasonable risk of injury or death. The complaint states that the FOP fosters fraternalism among its members and seeks to encourage member participation in the organization for the purpose of assisting the FOP in meeting its goals and objectives. As the Supreme Court has held, actions that "perceptibly impair" an organization's ability to carry out its mission impose a

"concrete and demonstrable" injury in fact. *Havens Realty Corp. v. Coleman* , 455 U.S. 363, 379 (1982).

Similarly, the Supreme Court has squarely held that a union may have standing to challenge governmental interference with organizing activities. For example, in *Allee v. Medrano* , 416 U.S. 802 (1974), the United Farm Workers brought suit against state officials in Texas alleging that they had conspired to deprive the union and others of their First Amendment rights. *Id* . at 804-05. The Court explained why the union was entitled to pursue its action:

> In this case the union has standing as a named plaintiff to raise any of the claims that a member of the union would have standing to raise . . . . [I]t has been implicitly recognized that protected First Amendment rights flow to unions as well as to their members and organizers. If, as alleged by the union in its complaint, its members were subject to unlawful arrests and intimidation for engaging in union organizational activity protected by the First Amendment, the union's capacity to communicate is unlawfully impeded, since the union can act only through its members. The union then has standing to complain of the arrests and intimidation and bring this action.

*Id* . at 819 n.13

In this case, the plaintiffs have met this burden and are entitled to proceed with their organizational standing claim.

The government nevertheless maintains that the FOP cannot demonstrate standing because the relief sought is individualized. They claim, the FOP cannot establish a claim without the personal involvement of each plaintiff. (Def. Mtn. at p.25) The government's argument fails for the simple reason that the FOP, is an organization specifically created to represent the interests of its membership concerning the terms and conditions of employment with the defendant. (Comp. ¶14) Membership in the FOP affords member access to legal representation by attorneys retained by the FOP, for the purpose of bringing legal action against the defendant,

23

even though the member would have a right to bring a suit in their own right. (Comp. ¶17) Moreover, the FOP has an obligation to its members to provide legal representation and assistance on behalf of any member concerning all matters relating to a member's employment with the defendant. (Comp. ¶18) Thus, the interests the FOP seeks to protect in this proceeding are germane to the FOP's purpose. (Comp. ¶19) Lastly, the claims asserted are not only for the individual plaintiffs but for those employees who have yet to be poisoned by Level I contamination. The complaint meets the pleading requirements for organizations standing and the defendant's argument to the contrary should be rejected.

As to the issue of whether the matter is time-barred by the FOP or plaintiff James Waters, Plaintiff Waters was not required to challenge the action in 1996. He was not a target of the policy and he had not been designated for spraying and became subject to the policy in 2007. Indeed, OC spray poisoning of FOP members has only occurred within in the past several years. Thus, plaintiff Waters could not have demonstrated a traceable "concrete and particularized" harm that was actual or imminent until such time as he had been designated for Level I contamination. *See e.g. Clarke v. Securities Indus. Ass'n,* 479 U.S. 388 (1987)("this is not to say, however, that all plaintiffs affected by a regulation or order have standing to sue") Waters and the FOP filed this action when there was a concrete discernable harm.

WHEREFORE plaintiff respectfully prays that this Honorable Court deny the defendant's motion to dismiss and schedule this matter for a scheduling conference.

Respectfully submitted,


*/s/ Stephen G. DeNigris, Esq.*
Stephen G. DeNigris, Esq.
D.C. Bar No. 440697
Counsel for the Plaintiff
2100 M Street NW Suite 170-283
Washington, D.C.  20037

Office:  (703)416-1036
Fax:     (703)416-1

Dated: July 10, 2008
     Albany, NY

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**FRATERNAL ORDER OF POLICE, D.C.**
**LODGE 1, NDW LABOR COMMITTEE,**
**INC.**, et. al.,

          Plaintiffs,

              v.                               08-cv-0039(RJL)

**ROBERT M. GATES**,

          Defendant.

_____/

**O R D E R**

     Upon considerations of the Defendant's Motion to Dismiss, Plaintiffs' Opposition and the

entire record in this case, and for such other good cause shown, it is

     **ORDERED** that the Defendants Motion is **GRANTED / DENIED.**

_____
UNITED STATES DISTRICT JUDGE

July _____, 2008
Washington, D.C.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing Plaintiffs' Response in Opposition to Defendant's Motion to Dismiss was sent by Electronic Mail (e-mail) on the 10th day of July 2008, to the following:

John C. Truong, Esq.
Assistant United States Attorney
555 Fourth Street NW
Washington, DC  20530


_**/s/ Stephen G. DeNigris, Esq.**_
Stephen G. DeNigris, Esq.