**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **FRATERNAL ORDER OF POLICE, D.C.** | ) |
| **LODGE 1, NDW LABOR COMMITTEE, INC.,** | ) |
| *ET AL.*, | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ROBERT M. GATES,** | ) |
| **Secretary, U.S Department of Defense,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

Case No:  08-0039 (RJL)

**DEFENDANT'S REPLY IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS**

### I.     Introduction.

Association Plaintiffs and Individual Plaintiffs[1] file this action claiming that Defendant's

Level I oleoresin capsicum ("OC") spray training, as part of Defendant's non-lethal weapon

training program, violates their Fifth Amendment rights and the Administrative Procedure Act

("APA").  OC spray is more commonly known as pepper spray.  Level I training requires that the

trainee receive a short OC spray in the face.  Plaintiffs claim that this type of training will cause

physical and psychological injuries to the trainees.

---

[1]     There are five plaintiffs listed in the Complaint, including two associations and three individuals. The two association plaintiffs are the Fraternal Order of Police, D.C. Lodge 1 and Fraternal Order of Police First Federal Lodge 1-F (hereinafter "Association Plaintiffs").  The three individual plaintiffs include Messrs. Joseph Barbetta, Anthony Anziedo, and James. W. Waters (hereinafter  "Individual Plaintiffs").  These Individual Plaintiffs are civilian police officers working for the Department of the Navy, a department of the Department of the Defense.  Compl. at ¶ 8, 9 and 10.  Collectively they are often referred to as "Plaintiffs" in this Reply.

Plaintiffs, however, fail to establish that the Court has jurisdiction over Plaintiffs' APA claims as these claims involve personnel actions and are preempted by the Civil Service Reform Act. On the merits, even assuming the APA applies here, Plaintiffs' Opposition fails to identify a final agency decision subject to review under the APA. Furthermore, even assuming that there is a final agency decision, the decision to require all civilian police officers to participate in the OC spray training program is committed to agency discretion and hence not subject to judicial review.

Plaintiffs' Fifth Amendment claims are equally flawed. Specifically, Plaintiffs' Opposition conflates their substantive and procedural due process rights and fails to identify a specific fundamental right that is being violated by the OC spray training program. Moreover, Plaintiffs also fail to describe a specific procedure they claim is due to them. Finally, Plaintiffs abandoned their equal protection claim for failure to address it in the Opposition.

For these reasons and those set forth in Defendant's Motion to Dismiss, the Court should grant Defendant's Motion to Dismiss this case with prejudice.

## II.    Argument.

### A.    Plaintiffs' APA Claims (Counts IV and V)

#### 1. The CRSA Precludes Plaintiffs' APA Claims.

Plaintiffs' Opposition argues that the Level I OC spray training is not an adverse personnel action or that it will lead to their removal if they refuse to partake in the training. See Opp. at 7-10. Plaintiffs, therefore, argue that the Civil Service Reform Act (CSRA) does not apply in this case. Id. This is a curious argument because if Plaintiffs do not have concerns that they would suffer an adverse personnel action for not partaking in the training, then all they have

to do is not participate in it. However, the very fact that Plaintiffs have filed this lawsuit indicates that they believe that a failure to participate in the OC spray training may lead to disciplinary action or removal from federal service.

Discipline or removal for failure to participate in mandatory training is proper, and squarely falls within the purview of the CSRA and thus precludes Plaintiffs' APA claims. See Graham v. U.S. Dep't of Justice, No. 02-1231, 2002 WL 32511002, *2 (D.D.C. Nov. 20, 2002) (noting that "[t]he law is well established that the CRSA displaces all other bases for judicial review of personnel actions taken against federal employees, including the APA.").

Undeterred, Plaintiffs cite Spagnola v. U.S. Environmental Protection Agency, 859 F.2d 223 (D.C. Cir. 1988) for the proposition that they may pursue their constitutional claims outside of the CSRA. See Opp. at 11. Plaintiffs' reliance on Spagnola is misplaced. In Spagnola, the D.C. Circuit held that civil servants may seek equitable relief against their supervisors and agency in vindication of their constitutional rights. Id. at 230. However, that right is not absolute especially when the constitutional challenge is to a personnel action. Id. In such a circumstance, the D.C. Circuit held that the CSRA precludes such a review. Id. at 230.

Contrary to Plaintiffs' assertion, the CSRA can preclude constitutional claims if those claims involve a personnel action. See Cross v. Sampler, 501 F. Supp.2d 59 (D.D.C. 2007). In Cross, plaintiff, a probationary employee, sued under Title VII and for alleged constitutional violations of his First and Fifth Amendment rights. Id. at 60. The plaintiff alleged that the defendant terminated him for complaining about sexual harassment and supervisory misconduct. Id. at 62. The court in Cross observed that the plaintiff's claims involved personnel actions in the federal workplace and plaintiff could not "end-run the CRSA" by advancing constitutional

claims.  Id.  The court then  dismissed plaintiff's constitutional claims holding that "the CSRA establishes a comprehensive scheme for handling personnel disputes arising in the federal sector and its choices of remedies (or no remedies) must be respected by the courts."  Id. at 62.

Here, similar to the plaintiff in Cross, Plaintiffs attempt to "end-run the CSRA" by raising a Fifth Amendment constitutional challenge to Defendant's OC spray training program. Plaintiffs' Complaint, read in context, is nothing more than a complaint about Defendant's training requirement and that the failure to participate in the training may result in disciplinary action against them.  Accordingly, under the law, the CSRA precludes constitutional or APA review of the OC spray training program.

Plaintiffs also argue that the CRSA does not preclude their APA claims because they seek equitable relief in the form of vindication of their constitutional rights.  See Opp. at 13. Plaintiffs then assert that the APA waives sovereign immunity for actions not seeking monetary damages and therefore this waiver permits their APA as well as their non-statutory and constitutional claims.  Id.  This is a tautological argument because it centers on the assumption that Plaintiffs have a constitutional right not to go through the OC spray training as civilian police officers in the military.  As discussed in Section II.B infra, because Plaintiffs fail to state a claim for constitutional violation, their APA claim fails as a matter of law.  Furthermore, as discussed above, Plaintiffs cannot attempt to evade the CSRA's comprehensive remedial scheme by advancing constitutional claims for a personnel action.

### 2.    Plaintiffs Have Not Identified An Agency Decision Being Challenged.

Association Plaintiffs and Individual Plaintiffs conclusorily argue that the application of DOD Directive 3000.3 and OPNAVINST 5530.14D to Plaintiffs are final agency decisions

because these documents determine Plaintiffs' "rights or obligations" and "legal consequences." See Opp. at 14. This argument fails for two reasons.

First, Association Plaintiffs and Individual Plaintiffs fail to identify the "rights and obligations" or "legal consequences" that they have with respect to Defendant's mandatory OC spray training.

Second, as explained in Defendant's Motion, DOD Directive 3000.3 and OPNAVINST 5530.14D do not independently provide rights or legal consequences to Plaintiffs. Def. Motion at 11-12. Specifically, DOD Directive 3000.3 merely defines what constitutes non-lethal weapons and the policy on the use of non-lethal weapons. Id. at 11. The other manual at issue (OPNAVINST 5530.14D) specifically states, "This instruction is not intended to create any rights, substantive or procedural." See Def. Motion at Gov. 3 (Section 1 -- Purpose). Under these facts, the two regulations referenced in Plaintiffs' Complaint are not final agency decisions reviewable under the APA. See Safe Extensions, Inc. v. FAA, 509 F.3d 593, 598 (D.C. Cir. 2007) (noting that a reviewable final order is an agency disposition that "mark[s] the 'consummation of the agency's decision making process,' and it 'must determine rights or obligations' or give rise to 'legal consequences.'") (internal citations omitted).

## 4.     The Agency Decision Is Committed to Agency Discretion.

Even assuming that DOD Directive 3000.3 and OPNAVINST 5530.14D are final agency decisions, these two regulations are committed to the discretion of the agency and not reviewable. Plaintiffs, however, argue that not subjecting a training program like the use of OC spray to judicial review is "beyond belief." See Opp. at 15.

Without citing any legal authority, Plaintiffs suggest that the Court borrow the standard

of review for determining whether a substantive due process right was violated as the judicial

standard of review for DOD Directive 3000.3 and OPNAVINST 5530.14D.  See Opp. at 16.  In

that connection, Plaintiffs assert that the judicial standard of review is whether the OC spray

training method "shock[s] the conscience" because it violates the Fifth Amendment.  Id.

Plaintiffs' argument is legally untenable.

As a preliminary matter, Plaintiffs fail to dispute that the DOD Directive 3000.3 and

OPNAVINST 5530.14D implicate national security as these regulations describe the use of non-

lethal weapons as a law enforcement method to protect military installations and forces.  See

DOD Directive 3000.3, at ¶¶ 4.2.1 to 4.2.4 (explaining the policy behind the use of non-lethal

weapons is to "enhance the capability of U.S. forces to accomplish" certain objectives, including

preventing hostile action; limiting escalation; avoiding using lethal force in certain military

action; and to better protect our forces) (Def. Motion at Gov. Exh. 1).  Furthermore, Plaintiffs'

Opposition does not dispute that agency decisions that implicate military policies or national

security are beyond the purview of the judiciary.   See District No. 1, Pacific Coast Dist., Marine

Eng.' Beneficial Assoc. v. Maritime Admin., 215 F.3d 37 (D.C. Cir. 2000) (holding that a

decision to transfer U.S. vessels implicated national defense and foreign policy and therefore

was "not fit for judicial involvement); Nat'l Federation of Fed. Employees v. United States, 905

F.2d 400 (D.C. Cir. 1990) (holding that courts are not equipped to conduct review of the nation's

military policy); see also Def. Motion at 14-15.

Furthermore, even assuming arguendo that "shock the conscience" is the appropriate

judicial standard, as suggested by Plaintiffs, to use to review DOD Directive 3000.3 and

OPNAVINST 5530.14D under the APA, Plaintiffs' argument still fails because other courts have

held that the use of pepper spray (OC spray) within the context of law enforcement was reasonable.  See, e.g., Mecham v. Frazier, 500 F.3d 1200 (10th Cir. 2007)(use of pepper spray reasonable when subject failed to obey a direct order);  Wagner v. Bay City, Texas, 227 F.3d 316, 324 (5th Cir. 2000)( use of chemical spray objectively reasonable when suspect physically resisted arrest); Ludwig v. Anderson, 54 F.3d 465, 471 (8th Cir. 1995); Lawyer v. City of Council Bluffs, Iowa, 240 F. Supp. 2d 941, 953 (S.D. Iowa 2002), aff'd, 361 F.3d 1099 (8th Cir. 2004) (use of pepper spray not excessive even when crimes not serious).  See also Bloomer v. Rock Island Police Officers Williams,, 2007 WL 2684079 (C.D. Ill 2007) (use of pepper spray reasonable when bicyclist failed to obey orders and tried to ride off).   Therefore, it logically follows that the use of OC spray as a training method to train civilian police officers (like Individual Plaintiffs) guarding military bases is also reasonable and does not "shock the conscience."

### 5.    DOD Directive 3000.3 and OPNAVINST 5530.14D Are Not Arbitrary and Capricious.

Plaintiffs contend that DOD Directive 3000.3 and OPNAVINST 5530.14D are arbitrary and capricious because Defendant is applying "military standards to civilian law enforcement." See Opp. at 19.  Plaintiffs further assert that "[t]here is no legitimate reason to support the use of a standard developed for combat troops in war zone" to civilian law enforcement.  Id.  Plaintiffs conclude by arguing that the agency's decision in this matter "is not the product of reasoned thought."  Id.  Plaintiffs' arguments lack merit.

First, the three Individual Plaintiffs are employed by the U.S. Department of Defense to work as "civilian police officers" on U.S. Naval bases in Philadelphia and Washington, D.C. See Complaint at ¶ 8,9, and 10.  Furthermore, under 10 U.S.C. § 1585, the Secretary of the

Department of Defense has the authority to issue regulations governing the carrying of firearms and other appropriate weapons by civilian officers and employees.  See 10 U.S.C. 1585 ("Under regulations to be prescribed by the Secretary of Defense, **civilian officers** and employees of the Department of Defense may carry firearms or other appropriate weapons while assigned investigative duties or such other duties as the Secretary may prescribe.") (emphasis added). Therefore, the argument that Plaintiffs – as civilian officers working on military bases –  should not be subject to miliary standards is not logical and unsupported by law.

Second, as explained in Defendant's Motion, the OC spray training program has its genesis in the statutes passed by Congress establishing the Department of Defense and the Department of the Navy and various regulations.  Def. Motion at 16-17.  Plaintiffs, however, simply fail to dispute this altogether.  Finally, Plaintiffs fail to address the Declaration of Lt. Col. Stephen Simpson, who explained that the use and training of non-lethal weapons grew out of the Marine Corp's successful mission in Somalia.  See Lt. Col. Simpson Decl. at ¶ 4 (Def. Motion at Gov. Exh. 6).  Lt. Col. Simpson elaborated that Defendant's OC spray training program was adopted from the local law enforcement departments.  Id. at ¶ 10.  Indeed, Lt. Col. Simpson explained that the training requirements were based on Defendant's observation of and participation in the training conducted by the Los Angeles Sheriff's Department.  Lt. Col. Simpson further explained that the OC spray training is essential to law enforcement because police officers have a high probability of being exposed to the OC spray.  Lt. Col. Simpson Decl. at ¶ 11, 15.  The goal of the training is to teach the students (i.e., police officers like the Individual Plaintiffs) to protect themselves and their weapons in the event that they are contaminated.  Id. at ¶ 15.

Given that the OC spray training has a statutory basis and that the training itself was adopted from non-military law enforcement entities, DOD Directive 3000.3 and OPNAVINST 5530.14D are not arbitrary and capricious for purposes of training civilian police officers to guard U.S. military bases.

**6.     The OC Spray Training Is Within Defendant's Statutory Authority.**

Although Plaintiffs' Complaint alleges that the OC spray training exceeds Defendant's statutory authority and limitation (Compl. at ¶ Count V), Plaintiffs fail to identify the authority or limitation that Defendant purportedly exceeded.  Without citing to any authority, Plaintiffs conclusorily argue that the statutes allowing Defendant to issue regulations governing the use of firearms and other appropriate weapons is a far cry from authority to spray civilian police officers with a toxin.  See Opp. at 18.  Plaintiffs' argument misses the point.

As explained in Defendant's Motion, the interplay of the statutes creating the Department of Defense and the Department of the Navy also allow the Defense Department to formulate policies and programs to protect national security objectives.  Def. Motion at 16-17.  In that vein, DOD Directive 3000.3's stated "Purpose" is for the Department of Defense to establish "policies and assign responsibilities for the development and employment of non-lethal weapons."  Def. Motion at Gov. Exh. 1.  Under this statutory and regulatory scheme, it is within Defendant's statutory authority to develop the OC spray training program for civilian police officers guarding U.S. military interests.  Therefore, the regulations developing and implementing the OC spray training is comfortably within the statutory scheme designed by Congress.

**B.     Plaintiffs' Fifth Amendment Claims (Count I, II & III)**

The gravamen of Plaintiffs' Complaint is that both their Fifth Amendment substantive

and procedural due process rights have been violated because Defendant requires the Individual

Plaintiffs to go through the OC spray training program. Yet, Plaintiffs barely devote two pages

of their lengthy Opposition brief to these claims. In fact, Plaintiffs fuse their substantive and

procedural due process claims and their arguments are not supported by law.

### 1.    Substantive Due Process (Count I)

Plaintiffs' Opposition fails to identify a particular substantive due process right that

Defendant allegedly violated. Plaintiffs, however, repeat their mantra that the OC spray training

implicates their substantive due process because the training "shocks the conscience." See Opp.

at 11, 16 & 20. Merely calling law enforcement training "a shock to the conscience" does not

create a substantive due process right.

In the D.C. Circuit, substantive due process analysis has two aspects to it. See Abigail

Alliance for Better Access to Developmental Drugs v. von Eschenbach, 495 F.3d 695 (D.C. Cir.

2007). In Abigail, the D.C. Circuit held,

> First, we have regularly observed that the Due Process Clause specifically
> protects those fundamental rights and liberties which are, objectively, deeply
> rooted in this Nation's history and tradition and implicit in the concept of ordered
> liberty, such that neither liberty nor justice would exist if they were sacrificed.
> Second, we have required in substantive-due-process cases a careful description
> of the asserted fundamental liberty interest.

495 F.3d at 702 (quoting Washington v. Glucksburg, 521 U.S. 702, 720-21. See also Johnson v.

Quander, 370 F. Supp.2d 79, 89 (D.D.C. 2005). Moreover, to assert such a claim, Plaintiffs must

show that the conduct is so egregious and so outrageous that it may be fairly said to shock the

contemporary conscience. McManus v. District of Columbia, 530 F. Supp.2d 46, 71 (D.D.C.

2007).

Here, Plaintiffs' lengthy Opposition glosses over what deeply rooted fundamental rights

or liberties the OC spray training program allegedly violated.  <u>See</u> Opp. at 20-21.  More

egregiously, Plaintiffs fail to carefully describe the fundamental liberty interest at stake.

Plaintiffs' broad brush allegations that being sprayed with OC spray may cause physical and

psychological injury is not sufficient to identify a fundamental right at stake.  <u>Abigail</u>, 495 F.3d

at 702.

Citing  <u>County of Sacremento v. Lewis</u>, 523 U.S. 833 (1998) and <u>Butera v. District of

Columbia</u>, 235 F.3d 637 (D.C. Cir. 2001) out of context, Plaintiffs essentially argue that they

have a substantive due process right not to be subject to the OC spray training.  <u>See</u> Opp. at 21-

22.  Plaintiffs' reliance on these cases is misplaced.  In <u>County of Sacramento</u>, a case brought

pursuant to 42 U.S.C. §1983, the Supreme Court granted *certiorari* to address the standard of

culpability on the part of law enforcement officers for violating the Fourteenth Amendment

substantive due process right in a car pursuit case.  <u>Id.</u> at 839.  In that case, in a high speed

automobile chase, the police struck and killed a passenger who fell off a speeding motorcycle

that was being chased.  <u>Id.</u>  The Supreme Court noted that if the purpose to cause harm is

unrelated to the legitimate object of arrest, then the conduct will satisfy the element of arbitrary

conduct shocking to the conscience, necessary for a due process violation.  <u>Id</u>. at 836.  Within

the context of the case, the Supreme Court held that "a high-speed chase with no intent to harm

suspects physically or worsen their legal plight do not give rise to liability under the Fourteenth

Amendment, redressible by an action under § 1983."  523 U.S. at 854.

Similarly, <u>Butera v. District of Columbia</u>, 235 F.3d 637 (D.C. Cir. 2001), like <u>County of

Sacramento</u>, was an action brought pursuant to 42 U.S.C. § 1983 seeking monetary damages.  In

that case, Butera acted as a government informant in an undercover operation, during which

Butera was murdered.  Id. at 641-43.  Butera's personal representative sued the D.C. police

alleging violation of his Fourteenth Amendment substantive due process right.  Id.  The police

raised qualified immunity defenses.  The district court held that Butera had a constitutional right

to life and his personal representative had a constitutionally protected liberty interest.  Id. at 647.

In reversing the district court, the D.C. Circuit observed that in evaluating a substantive

due process claim in which state officials raised a qualified immunity defense, courts must

determine whether the plaintiff has identified a constitutional right at the appropriate level of

specificity.  235 F.3d at 646.  The D.C. Circuit opined that the constitutional right cannot be

stated in overly general terms.  Id. at 647.  The D.C. Circuit found that the plaintiff failed to

identify the constitutional right with any specificity and, in dismissing the case, held that the

police officers were entitled to qualified immunity.  Id. at 654.

Neither County of Sacramento nor Butera applies here because Plaintiffs have not

advanced a Section 1983 claim.  More importantly, in this case, Plaintiffs fail to state with

specificity what fundamental interest is at stake that is protected by the Fifth Amendment

substantive due process clause.  Plaintiffs appear to advocate expanding the substantive due

process right to cover law enforcement training techniques, such as the OC spray method.  See

Opp. at 20-21.  However, the Supreme Court has repeatedly counseled against expanding the

concept of substantive due process.  County of Sacramento, 523 U.S. at 842 (noting that the

Court has "always been reluctant to expand the concept of substantive due process.").  Indeed, in

Abigail, the D.C. Circuit noted that courts must "exercise the utmost care whenever we are asked

to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly

transformed into the policy preferences of the [courts' members]."  495 F.3d at 702 (quoting

Glucksburg, 521 U.S. at 720) (brackets in original).

To the extent that Section 1983 cases provide some guidance regarding the substantive due process claims raised by Plaintiffs, the holding in Fierson v. District of Columbia, 315 F. Supp.2d 52 (D.D.C. 2004) aff'd, 506 F.3d 1063 (D.C. Cir. 2007) is instructive.  In Fierson, plaintiff was a District Police Officer who had to undergo Armament Systems Proficiency ("ASP") training, which included training in the use of the ASP baton.  The training required Fierson to engage his instructor, who played the role of a violent suspect, in physical combat.  Id. at 54.  During the course of training, Fierson was hit, punched, kicked, kneed and suffered severe spinal injuries resulting in his retirement.  Id. at 61-62.  In his Section 1983 suit, Fierson alleged that the training violated his substantive due process rights as the training constituted arbitrary executive action that shocked the conscience.

Relying on County of Sacramento, the district court dismissed Fierson's claims and held that it must closely examine the circumstances regarding the use of force to determine if an abuse of power shocking to the conscience had occurred.  Id. at 61.  The district court noted that the factors to consider included "the need for the application of the force, the relationship between the need and the amount of force ... the extent of injury inflicted, and whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  Id. at 61 (quoting Norris v. District of Columbia, 737 F.2d 1148, 1150 (D.C. Cir. 1984)).  The district court concluded that the police department had an important interest in training its officers to use the tools and weapons that they are equipped with so that they can effectively carry out their law enforcement duties.  Id. at 62-63.  Moreover, there was no evidence that the training officers applied force sadistically or maliciously for the

very purpose of causing harm. <u>Id.</u> at 63. Consequently, the district court concluded that, when viewed in the context of a combat exercise, the training at issue did not shock the conscience. <u>Id</u>. at 62.

On appeal, the D.C. Circuit affirmed and held that the training was not so egregious as to shock the contemporary conscience. <u>Feirson v. District of Columbia</u>, 506 F.3d 1063, 1066-67 (D.C. Cir. 2007). The D.C. Circuit noted that the training followed several hours of classroom and practical instruction on how to use the ASP and it was designed to prepare police officers to handle real life situations. <u>Id</u>.

Like the training in <u>Fierson</u>, the OC spray training is designed to allow civilian police officers to carry OC spray and to handle real-life situations. The training is not done with the intent to cause harm. Rather, it is given in good faith to ensure that police officers can deal with secondary contamination of OC spray. <u>See</u> Lt. Col. Simpson Decl. at ¶ 15. Just as the ASP training in <u>Feirson</u> does not shock the conscience, the OC spray training herein, which will allow the civilian police officers to carry the device, does not shock the conscience.[2]

Finally, because Plaintiffs have failed to specify what fundamental liberty interest is at stake, without more, their substantive due process claim is legally infirm.[3] Even assuming

---

[2]Plaintiffs claim that the spraying of oleoresin capsicum to the face causes a host of terrible  physiological reactions. <u>See</u> Opp. at 16.  However, despite Plaintiffs' dramatic description of the potential effects, the OC spray training has been in effect since 1996 and 83 police officers had gone through the training, and none of the officers suffered permanent injuries or died as a result of the training. <u>See</u> Declaration of Eric Hammett at ¶¶ 6-7 (Gov. Reply Ex.  A)

[3]Plaintiffs also cite <u>Collins v. Harker Heights</u>, 503 U.S. 115 (1992), another 42 U.S.C. §1983 case, for the general proposition that the government action must shock the conscience. In <u>Collins</u>, plaintiff, a sanitation worker, died of asphyxiation after entering a manhole to unstop a drain line.  His widow sued claiming that by failing to properly train its employee, the city

*arguendo* that the use of the OC spray as part of law enforcement training implicates Plaintiffs'

substantive due process, Plaintiffs' claim still fails because, as explained in Defendant's Motion,

the use of OC spray by law enforcement officers has been found to be reasonable within a law

enforcement context.  Def. Motion at 20-21.  Plaintiffs' Opposition, however, fails to address

this issue.

Accordingly, there is simply no support for Plaintiffs' proposition that a training

requirement –  which is consistent with statutory authority to properly train civilian police

officers in the use of OC spray – is the type of fundamental liberty interest that is objectively

deeply rooted in this Nation's history.  The Court, therefore, should dismiss Plaintiff's due

process claim (Count I).

**2.      Procedural Due Process (Count II).**

In Count II, Plaintiffs allege that the training in question creates an unreasonable risk of

injury or death and/or of inflicting severe emotional or physiological injury without due process

of law.  See Compl. at Count II.  However, as argued in Defendant's Motion, Plaintiffs fail to

state what, if any, process is due them.  The identification of the process due to Plaintiffs is

crucial for this claim.  See Doe v. District of Columbia, 93 F.3d 861, 870 (D.C. Cir. 1996).

Plaintiffs' Opposition barely addresses the procedural due process issue beyond a cursory

reference to the Fifth Amendment.  See Opp. at 21.  Plaintiffs obliquely cite Board of Regents of

State Colleges v. Roth, 408 U.S. 564 (1972) to argue that, by definition, federal government

agencies are subject to the Fifth Amendment whenever they make employment decisions that

---

deprived Collins of his right to be free from unreasonable risks to his life, mind and body.   The
Supreme Court held that the failure to train was neither arbitrary nor conscience-shocking in a
constitutional way.

affect property or liberty interests.  See Opp. at 21.  That is the sum of their procedural due

process argument.  Plaintiffs, however, fail to specify their liberty or property right, the source

form which such right arises and what, if any, process to which they are entitled.[4]

     In Board of Regents, a case which found that no procedural due process right existed for

a non-tenured professor, the Supreme Court held that if a liberty or property interest has been

implicated, then procedural due process rights exist.  Therefore, Board of Regents is inapposite

here.  In any event, as the D.C. Circuit has pointed out, a party alleging a procedural due process

violation must suggest what sort of process is due.  Doe, 93 F.3d at 869; see also Medina v.

District of Columbia, 571 F. Supp. 2d 272, 281 ("At a minimum, a procedural due process claim

'requires the plaintiff to identify the process that is due.'" (internal citation omitted).

     In this case, even assuming that there is a liberty interest at stake, Plaintiffs have failed to

show what process, if any, is due them.  Without meeting this basic requirement, Plaintiffs'

procedural due process claims simply cannot survive.  Indeed, Plaintiffs have had two

opportunities – their Complaint or Opposition brief –  to identify what process is due them but

they simply failed to do so.  Without more, Plaintiffs' procedural due process claim (Count II)

fails to state a claim for which relief may be granted.[5]

---

[4]     Plaintiffs' argument regarding having them don bullet proof vests to experience the effects of being shot is a red herring.  When officers use a firearm, they are using lethal force.  When using a firearm, there is a reasonable likelihood that death or serious bodily harm will result.  The goal is to render the person at whom the shot is fired incapable of continuing the activity – either by death or serious bodily harm.  See OPNAVINST 5530.14D ¶1302 f(4).  There is no comparison between understanding the effects of a non-lethal weapon and being able to fight through the effects of a non-lethal weapon and use of a lethal weapon.

[5]     Of course, if Plaintiffs fail to participate in the OC spray training and Defendant take a personnel action against them, Plaintiffs will receive whatever process rights are accorded them under the CSRA.

### 3.  Equal Protection Claim (Count III)

Plaintiffs fail to address Defendant's Motion to Dismiss their equal protection claim (Count III) and therefore Plaintiffs have conceded that argument.  Bancoult v. McNamara, 227 F. Supp.2d 144, 149 (D.D.C.2002) (noting that "if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.") (internal citations omitted).  Accordingly, the Court should dismiss Plaintiffs' equal protection claim (Count III) as conceded.

### C.  Association Plaintiffs Lack Standing.

Defendant does not dispute that the law allows an association to sue on behalf of its members in certain circumstances.  However, in the context of this case, the Association Plaintiffs lack standing to sue on behalf of their members because the alleged injuries are too peculiar to the members and hence individual participation by the members is needed.  See Warth v. Seldin, 422 U.S. 490, 515-16 (1975).

Specifically, the Complaint alleges that the OC spray training creates an unreasonable risk of injury or even death, and that the training inflicts severe and psychological injury on the Individual Plaintiffs.  See generally Compl. at Counts I and II.  Evidence showing that the OC spray causes psychological or emotional harm is peculiar to the Individual Plaintiffs, requiring their participation in the lawsuit.  Plaintiffs, however, argue that Defendant's lack of standing argument fails because the Association Plaintiffs were specifically created to represent the Individual Plaintiffs.

17

Association Plaintiffs' contention misses the point.  Defendant does not dispute that the Association Plaintiffs were created to provide legal representation on behalf of the Individual Plaintiffs or assist the members in areas related to their employment.  However, in this case, the alleged psychological and emotional injuries are too particularized as to require the Individual Plaintiffs' participation and, therefore, associational standing is lacking.  <u>See</u> Def. Motion at 26. Plaintiffs' Opposition does not even address the peculiar injury issue at all and, therefore, conceded the issue.  The Court should dismiss the Association Plaintiffs for lack of standing.

**D.      Statute of Limitations Issue.**

Defendant's Motion argues that, under 28 U.S.C. § 2401(a), claims by the Association Plaintiffs and that of Plaintiff James W. Waters are time barred.  Def. Motion at 23-24. Association Plaintiffs conceded this argument because they fail to argue that their claims were timely.  <u>See</u> <u>Bancoult</u>, 227 F. Supp.2d at 149 (noting that if the opposing party fails to address certain arguments made by the moving party, the court may treat those arguments as conceded).

Plaintiffs argue that Mr. Waters' claims are timely because he was not designated for OC spraying until 2007.  <u>See</u> Opp. at 24.  Plaintiffs further contend that they did not have to file this lawsuit until they had a concrete discernable harm.  This argument lacks merit.

Under the APA a cause of action accrues when a plaintiff may challenge a final agency action in court.  <u>Harris v. FAA</u>, 215 F. Supp.2d 209, 212 (D.D.C.  2002).  Pursuant to 28 U.S.C. § 2401(a), Plaintiffs must file a lawsuit within six years after the right of action first accrues.  It appears that the Association Plaintiffs and Plaintiff Waters had knowledge of the OC spray training program as early as July 2000 but they failed to bring this lawsuit until January 2008 and, therefore, their claims are approximately 18 months out of time.  Def. Motion at 24-25.  The

Court should dismiss claims by the Association Plaintiffs and Plaintiff Waters as untimely.

**III.     Conclusion.**

For the foregoing reasons and those set forth in Defendant's Motion to Dismiss, the

Court should grant Defendant's Motion and dismiss this case with prejudice.

Dated: August 4, 2008.                              Respectfully Submitted,

                                                    ___/s/___Jeffrey A. Taylor_____
                                                    JEFFREY A. TAYLOR, D.C. BAR # 498610
                                                    United States Attorney


                                                    ___/s/___Rudolph Contreras_____
                                                    RUDOLPH CONTRERAS, D.C. BAR #434122
                                                    Assistant United States Attorney



                                                    ___/s/___John C. Truong_____
                                                    JOHN C. TRUONG, D.C. BAR #465901
                                                    Assistant United States Attorney
                                                    555 Fourth Street, N.W.
                                                    Washington, D.C.  20530
                                                    (202) 307-0406

                                                    Attorneys for Defendant


 OF COUNSEL:
FRANK JIMENEZ
General Counsel of the Navy
JOHN D. NOEL
Senior Trial Attorney
Navy Litigation Office
720 Kennon St, S.E., RM 233
Washington Navy Yard, DC 20374

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE, D.C. LODGE 1, NDW LABOR COMMITTEE, INC. 711 4TH Street, N.W., Washington, D.C. 20001; FRATERNAL ORDER OF POLICE FIRST FEDERAL LODGE 1-F. 1336 Spring Garden Street, Philadelphia, PA 19123; JOSEPH BARBETTS, 203 Haegele Place, Mt. Royal, NJ 08061; ANTHONY ANZIDEO, 2616 South 12th Street, Philadelphia, PA 19148; JAMES W. WATERS, 3209 Radford Lane, Fort Washington, MD 20744, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | Civil Case No. 08cv39 (RJL) |
| ROBERT M. GATES, in his official capacity as Secretary of the Department of Defense, 1000 Defense Pentagon Washington, DC 20301-1000 | ) ) ) ) ) | |
| **Defendant.** | ) ) | |

### Second Declaration of Eric Hammett in Support of Defendant's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6)

I, Eric Hammett, declare the following to be true and correct.

1.    I am a Civilian Employee employed by the Department of the Navy.  Currently, I am employed as a Security Specialist for Commander Navy Installations Command.  I have held this position since July 7, 2008.

2.    Prior to that, I was the Supervisory Security Specialist (Regional Training Director) for the Naval District of Washington (NDW) Security Department.  In this position, I monitored the scheduling and training for all law enforcement officers employed by the Naval District of Washington.  I held that position from August 16, 2002 until July 6, 2008.

Gov. Reply Exh. A

3.     Prior to serving as the Supervisory Security Specialist (Regional Training Director), I was employed by the Naval District of Washington. My job title was Police Officer/Instructor. I was in that position from November 22, 1998 until August 16, 2002.

4.     One of the duties of position of Supervisor Security Specialist was to schedule training and to maintain the training records for the civilian law enforcement personnel assigned to the Naval District of Washington. I would receive reports if someone was injured during the course of training.

5.     One of the training courses required for Police Officers certification is Level I Oleoresin Capsicum training. Under this training, trainees receive a short burst of OC spray to their face.

6.     Level I Oleoresin Capsicum training started in 1996, since this time, all 0083 Police Officers employed by the Naval District of Washington have been trained and received a Level I Oleoresin Capsicum direct spray to the face with exception of the plaintiff employed with NDW . The discomfort/effects of Oleoresin Capsicum vary depending on the student. Typical discomfort lasts between 20 - 40 minutes and the discomfort is not permanent.

7.     During my tenure as the Supervisory Security Specialist, no Police Officers suffered serious illness or injury as a result of the OC spray training. Also, no Police Officers died as a result of the OC spray training.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of August, 2008

ERIC HAMMETT